[No. A048877. First Dist., Div. 2. June 10, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
C. AUTREY JOHNSON, Defendant and Appellant.

COUNSEL

Betsy Wolkin, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Martin S. Kaye and David D. Salmon, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**SMITH, J.**—Charged by information with unlawfully possessing cocaine (Health & Saf. Code, § 11350, subd. (a)) and a syringe (Bus. & Prof. Code, § 4149) and with resisting arrest (Pen. Code, § 148), defendant C. Autrey Johnson pled not guilty and moved in superior court to suppress evidence (*id.*, § 1538.5). When the court denied the motion, he entered a negotiated plea of guilty to cocaine possession and was sentenced to 16 months in prison. He appeals, challenging the suppression ruling. We affirm.

BACKGROUND

Defendant first sought suppression at the preliminary hearing in municipal court, and the motion was denied. It was then renewed in superior court and denied there as well, based solely on the preliminary hearing transcript, with no new evidence presented. In these circumstances, the superior court judge did not hear the matter de novo. He had to accept the municipal court judge's express and implied factual findings to the extent supported by substantial evidence and then independently apply the appropriate legal/constitutional standards to that state of the facts. ■ Our review standard on appeal is the same. We defer to all supported municipal court findings, draw all inferences in favor of that court's ruling, resolve legal/ constitutional issues independently and, in effect, disregard the superior court's conclusions. (*People* v. *Ramsey* (1988) 203 Cal.App.3d 671, 677-679 [250 Cal.Rptr. 309]; Pen. Code, § 1538.5, subd. (i); cf. *People* v. *Laiwa* (1983) 34 Cal.3d 711, 718

[195 Cal.Rptr. 503, 669 P.2d 1278]; *People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].)

The challenged search occurred in the common hallway of an apartment building at 4346 Third Street in San Francisco. The building, sandwiched "between two mom and pop type stores," apparently had just three units—apartment 1 at ground level, apartment 2 opening onto a second-floor landing up two sets of interior steps, and apartment 3, which opened onto a third-floor landing at the top of more steps going up to the left from the second-floor landing.

Police officer Brian Danker and his partner, Officer Dinslage, were on duty at about 4:30 p.m. on August 25, 1989, when dispatch reported an anonymous complaint that "someone was selling drugs or doing drugs in the hallway of [the] apartment building." The officers, both in uniform, went to the address, found the street door unlocked, stepped inside a hallway and started up a short flight of steps to a first landing below the second floor. It was very dark inside, dimly lit by a single bulb.

They reached the first landing and paused. As their eyes adjusted to the darkness, they saw defendant just off the second-floor landing, on the first steps leading to the third floor. He was "crouched over in the corner," 12 to 15 feet away, angled perpendicular to them yet facing them. Danker related: "I was startled by the fact that somebody was there instead of just being there, and saying, 'Yes, Officer,' or walking past us. I didn't understand why this person was in that position and acting like that at first."

Defendant stood up. Danker then repeatedly said, " 'Come down towards me. Step down off that landing. Come down towards me . . . .' " Defendant was "staring right at" him but gave no response. Danker recalled: "I repeated it four times. He wouldn't come down or move anywhere towards us. Then I said if I have to repeat myself one more time I'm going to come up there to get you." At that demand, defendant moved his right hand to his mouth, as if to put something in it, and simultaneously fled up the stairs toward the closed door of apartment 3. (Defendant did not live in the building, but the officers apparently did not know him or where he lived.)

Danker did not see exactly what defendant put in his mouth. He testified: "I just saw some type of substance, which I suspected to be possibly rock cocaine." His suspicion was an assumption based on experience in working the Potrero District, where "basically" all of his arrests had involved rock cocaine.

The officers tackled defendant as he fled up the stairs. A "serious non-injury wrestling match" ensued, and it took the officers a full five minutes to

get defendant "finally subdued and into handcuffs." Danker, who did not recall whether the cuffs were in front or in back, explained: "I wanted cuffs on him and I didn't care where."

Once subdued and handcuffed on the second-floor landing, defendant was brought to his feet. Dinslage at that point saw something in his mouth and, with Danker's help, tried to retrieve it.[1] The effort took about a minute and worked. Danker held defendant from behind in a control hold, his right arm around defendant's neck and his left hand grasping and pulling on the right hand fist so that the arm forced defendant's head up and back against the officer. Danker deliberately kept the *crook* of his arm in front of the neck. Demonstrating for the court, he explained: "[T]he procedure . . . for a control hold is keeping it in the small of your hold [*sic* ] instead of the bar of your arm. If you can use the bar of your arm you have a situation where you can end up choking the person and killing them."

While Danker restrained defendant in that manner, Dinslage stood in front with one or both hands on the lower part of defendant's face. He was squeezing or "[c]lenching" the jaw, trying to get it open. Defendant resisted and made "gagging" noises. Then "[a]n object came flying out of [his] mouth"—a single white rock of what was stipulated below to be cocaine. It fell to the carpeted floor of the landing, where Dinslage seized it as evidence.

Afterward, Danker picked up a Ford Pinto repair book which had dropped from under defendant's arm sometime during the struggle. As he did, a hypodermic needle fell out from between the pages. It was also seized as evidence.

Defendant did not testify but called Helen Williams, who lived in apartment 2 and saw part of the incident. She knew defendant from speaking with him on the street and had once let him into her apartment to use the bathroom.

Williams recounted hearing a moan outside her door (like a crying out) and opening it. She saw defendant, his hands behind him (as if handcuffed), being held against a wall just outside her doorway, two or three feet away, by one of the officers. The officer held him with one hand under defendant's chin, his fingers around defendant's neck, about half way up his throat. Demonstrating for the court, she showed the officer's thumb on one side of the neck and the fingers around the other, as though pushing into the Adam's

---

[1]Danker testified without objection to the perceptions of his partner. Dinslage was not called as a witness.

apple area. Defendant made noises—interpreted by the court as "choking and having a seizure, or something of that nature"—but could not get any words out.

According to Williams, the second officer just stood there, his hands at his side. The hallway was light enough to see, illuminated in part by an unshaded window. Neither officer had a gun, nightstick or mace drawn. Her view lasted only five or six seconds, though, because she went back inside when "[t]he officers said, 'Get back in your house and shut the damn door.' "

APPEAL

Defendant attacks the suppression ruling, contending that (1) he was detained without reasonable suspicion, (2) he was arrested without probable cause, and (3) the officers used excessive force, "choking" him to get the cocaine. We reject each point in turn.

I

The detention issue, we hold, was waived by failure to raise it anytime below. Generally, " 'questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.' " (*People* v. *Benson* (1990) 52 Cal.3d 754, 786, fn. 7 [276 Cal.Rptr. 827, 802 P.2d 330], quoting *People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].) This is also true of search and seizure questions. (*People* v. *Privitera* (1979) 23 Cal.3d 697, 710 [153 Cal.Rptr. 431, 591 P.2d 919, 5 A.L.R.4th 178], cert. den. 444 U.S. 949 [62 L.Ed.2d 318, 100 S.Ct. 419].) Trial counsel's argument in superior court that "probable cause" to arrest was lacking did not preserve the issue. We reject the notion that trial attorneys commonly use that terminology to connote unjustified *detentions* as well as arrests. Competent counsel would be acutely aware of the distinction.

Thus, we analyze the issue indirectly, on defendant's alternative argument that trial counsel denied him effective assistance by failing to raise the issue. To succeed on that theory, however, defendant must show that (1) competent counsel would have raised the issue and (2) a favorable result was reasonably probable had the issue been posed. (*In re Fields* (1990) 51 Cal.3d 1063, 1069-1070 [275 Cal.Rptr. 384, 800 P.2d 862], summarizing state and federal constitutional guaranties.) He cannot satisfy either component on this record because justification for a detention was clear.

■ "[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause. [¶] The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch."' . . . The Fourth Amendment requires 'some minimal level of objective justification' for making the stop. . . . That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. . . . [P]robable cause means 'a fair probability that contraband or evidence of a crime will be found,' . . . and the level of suspicion required for a [detention] is obviously less demanding than that for probable cause, . . . [¶] The concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.' . . . In evaluating the validity of a [detention], we must consider 'the totality of the circumstances—the whole picture.' . . ." (*United States* v. *Sokolow* (1989) 490 U.S. 1, 7-8 [104 L.Ed.2d 1, 10, 109 S.Ct. 1581], citations omitted.)

■ Viewing the evidence favorably to the ruling, the officers here had an anonymous report that someone was selling or doing drugs in the hallway of the building. They arrived to find a three-unit building in an area of the city where one of the officer's arrests had "basically" all involved rock cocaine. The hallway was so dimly lit that they had to allow their eyes to adjust from the light outside. There, a step or two above the second-floor landing, they saw defendant strangely crouched over in a corner, peering down at them and saying nothing. Both officers were in uniform. Defendant then stood up, still silent. Officer Danker repeatedly said, " 'Come down towards me. Step down off that landing. Come down towards me. . . ." The cold record does not reveal his tone of voice, but we imply in support of the ruling that it was coaxing rather than demanding. Still, defendant stared, saying and doing nothing. Danker, his voice apparently insistent, then warned, "[I]f I have to repeat myself one more time I'm going to come up there to get you."

■ The Attorney General suggests, and we agree, that at that point, " 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " (*Michigan* v. *Chesternut* (1988) 486 U.S. 567, 573 [100 L.Ed.2d 565, 572, 108 S.Ct. 1975], quoting *United States* v. *Mendenhall* (1980) 446 U.S. 544, 554 [64 L.Ed.2d 497, 509, 100 S.Ct. 1870].) Such an impression may be conveyed by a "tone of voice indicating that compliance with the officer's request might be compelled." (*United States* v. *Mendenhall, supra,* at p. 554 [64 L.Ed.2d at p. 509], citations omitted.)

■ Defendant did not submit to that show of authority, however. Instead he made a motion to his mouth and fled up the stairs. Under very

recent high court authority clarifying the so-called *Mendenhall* test of detention quoted above, a person reasonably believing he is not free to leave is nevertheless not detained for Fourth Amendment purposes until he either submits to that show of authority or is physically seized by the officer. (*California* v. *Hodari D.* (1991) __U.S. __, __ [113 L.Ed.2d 690, 698, 111 S.Ct. 1547, 1551].) Adapting the holding of *Hodari D.* to our facts: "[A]ssuming that [the officers' conduct] in the present case constituted a 'show of authority' enjoining [defendant] to halt, since [he] did not comply with that injunction he was not seized until he was tackled." (*Id.*, at p. __ [113 L.Ed.2d at p. 699].)

We hold that reasonable suspicion existed then. An untested informant's general, uncorroborated report of criminal activity, without more, may lack reliability to support probable cause. ▮ However, "[t]his is not to say that an anonymous caller could never provide the reasonable suspicion necessary for [an investigative detention]." (*Alabama* v. *White* (1990) 496 U.S. 325, __ [110 L.Ed.2d 301, 308, 110 S.Ct. 2412] (*White*).) "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." (*Id.*, at p. __ [110 L.Ed.2d at p. 309].)

In *White*, reasonable suspicion arose from an anonymous phone tip that a named woman carrying cocaine in a brown attache case would be leaving an apartment to drive in a brown Plymouth station wagon with a broken taillight to a motel at a particular time. Police were justified in stopping a woman (name unknown) who emerged from the apartment building within the foretold time (without an attache case), got in a car like the one described and drove to the motel. (496 U.S. at pp. __-__, __-__ [110 L.Ed.2d at pp. 306-307, 309-310].)

▮ The tip here was less detailed but, significantly, could only have been given by someone who had just been in the hallway of what the officers found to be a small, three-unit apartment building. This gave some insight into the caller's " 'basis of knowledge.' " (*White, supra,* 496 U.S. 325, __ [110 L.Ed.2d 301, 308].) Also, the tip implied someone hanging out in the hallway, a far more unusual activity than the mundane departure of the woman in *White*. The officers arrived right after the report and, indeed, saw a man in the hallway—not coming or going but strangely crouched over in a corner. The dark hallway plus defendant's odd position and mute demeanor could reasonably suggest to an officer experienced in rock cocaine arrests that criminal activity may be afoot. ▮ "[C]orroboration is sufficient if

police investigation has uncovered probative indications of criminal activity along the lines suggested by the informant. . . . Even observations of seemingly innocent activity provide sufficient corroboration if the anonymous tip casts the activity in a suspicious light. . . ." (*People* v. *Johnson* (1990) 220 Cal.App.3d 742, 749 [270 Cal.Rptr. 70], citations omitted; cf. *People* v. *Costello* (1988) 204 Cal.App.3d 431, 446 [251 Cal.Rptr. 325], cert. den. (1989) 492 U.S. 921 [106 L.Ed.2d 595, 109 S.Ct. 3294].) ▮ Suspicion was heightened by Officer Danker's *personal experience*, from past arrests in the area, that rock cocaine use was prevalent there. (*In re Frederick B.* (1987) 192 Cal.App.3d 79, 86 [237 Cal.Rptr. 338].) Then, defendant's complete lack of response after standing up, and his staring as Danker asked him repeatedly to come down, added suspicion to an already bizarre encounter. Finally, suspicion abounded once defendant made the hand-to-mouth movement, as though secreting drugs, and fled up the stairs.

Reasonable suspicion of drug possession existed.

II

▮ Defendant next claims that the officers arrested him without probable-cause justification when, after he moved his hand to his mouth and fled up the stairs, they tackled and handcuffed him. We disagree with the premise that he was arrested at that point and thus find his analysis misfocused.

We have already held (pt. I, *ante*) that reasonable suspicion supported a detention when defendant made the motion to his mouth and fled. This in turn precipitated the tackle and five-minute "wrestling match" in which the officers subdued, handcuffed and stood him up. We hold that those restraining actions constituted not an arrest, but a forcible detention.

▮ Having reasonable suspicion, the officers had constitutional authority to use "the least intrusive means reasonably available to verify or dispel [their] suspicion in a short period of time. [Citation.]" (*Florida* v. *Royer* (1983) 460 U.S. 491, 500 [75 L.Ed.2d 229, 238, 103 S.Ct. 1319].) The least-intrusive-means limitation is "directed at the length of the investigative stop, not at whether the police [have] a less intrusive means to verify their suspicions before stopping" a suspect. (*United States* v. *Sokolow, supra,* 490 U.S. 1, 11 [104 L.Ed.2d 1, 12].)

The right to verify or dispel suspicion is meaningless unless officers may, when necessary, *forcibly* detain a suspect. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or *a criminal to escape.* On the contrary, . . . [a] brief stop of a

suspicious individual, in order to determine his identity or *to maintain the status quo momentarily* while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." (*Adams* v. *Williams* (1972) 407 U.S. 143, 145-146 [32 L.Ed.2d 612, 617, 92 S.Ct. 1921], italics added.) With reasonable suspicion, "the officer is entitled to make a *forcible* stop" and, if he has reason to believe the suspect is armed and dangerous, conduct a limited search for weapons. (*Id.*, at p. 146 [32 L.Ed.2d at p. 617], italics added, fn. omitted.)

Thus, "[a] police officer attempting to make an investigatory detention may properly display some force when it becomes apparent that an individual will not otherwise comply with his request to stop, and the use of such force does not transform a proper stop into an arrest. [Citations.]" (*United States* v. *Thompson* (9th Cir. 1977) 558 F.2d 522, 524, cert. den. *sub nom. Reeve* v. *United States* (1978) 435 U.S. 914 [55 L.Ed.2d 504, 98 S.Ct. 1466]; accord *United States* v. *Perate* (4th Cir. 1983) 719 F.2d 706, 709.) "Levels of force and intrusion in an 'investigatory stop' may be legitimately escalated to meet supervening events, such as attempted flight . . . . [¶] A 'reasonable' reaction in this context, like 'probable cause,' turns on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" (*United States* v. *White* (D.C.Cir. 1981) 648 F.2d 29, 40 [208 App.D.C. 289], citations omitted, cert. den. 454 U.S. 924 [70 L.Ed.2d 233, 102 S.Ct. 424]; *United States* v. *Richards* (9th Cir. 1974) 500 F.2d 1025, 1028-1029, cert. den. (1975) 420 U.S. 924 [43 L.Ed.2d 393, 95 S.Ct. 1118].) Even "a complete restriction [of liberty], if brief and not excessive under the circumstances, may constitute a valid '*Terry* stop' and not an arrest. [Citations.]" (*United States* v. *Robertson* (9th Cir. 1987) 833 F.2d 777, 781, referring to *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868].)

 Officers here had to physically restrain defendant before they could investigate any further since he had bolted up the stairs toward the third apartment, obviously unwilling to remain or comply with their request to come down.[2] It took two officers five minutes of "serious non-injury wrestling" to get him subdued and upright. Handcuffs were needed to do it. Defendant does not argue otherwise. The record shows that the officers used no more force than was reasonably necessary in the circumstances to effectuate the detention.

 A suspect's resistance cannot unilaterally elevate a detention into an arrest. Just as "resistance alone does not make an otherwise proper search

---

[2]Given their right to forcibly detain, California precedent arguably would have allowed the officers to *arrest* for flight which unlawfully delayed the performance of their duties (Pen. Code, § 148, subd. (a); *In re Gregory S.* (1980) 112 Cal.App.3d 764, 778 [169 Cal.Rptr. 540]), although this theory was not raised below.

illegal" (*People* v. *Bracamonte* (1975) 15 Cal.3d 394, 406 [124 Cal.Rptr. 528, 540 P.2d 624], citations omitted), resistance alone does not make an otherwise proper *seizure* illegal. "[U]tilization of force in making a stop will not convert the stop into an arrest if it is precipitated by the conduct of the individual being detained [citations]." (*United States* v. *Beck* (9th Cir. 1979) 598 F.2d 497, 501.) If suspects could convert detentions into arrests by their own flight or violence, sophisticated or simply violence-prone suspects might never be detained on less than probable cause, an absurd result.[3]

Also, "[t]he fact that a defendant is handcuffed while being detained does not, by itself, transform a detention into an arrest. . . . Instead, the issue is whether the restraint employed exceeded that which was reasonably necessary for the detention. . . ." (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 385 [269 Cal.Rptr. 447], citations omitted.) In *Carlos M.*, for example, it was held that handcuffing a suspect in a police car on the way to a hospital for identification by a rape victim did not amount to a de facto arrest. The detention was not unreasonably long, and the handcuffs were justified by concern for officer safety. "Since a patdown search is not an infallible method of locating concealed weapons, the temporary use of handcuffs for safety purposes, used in this instance by a single officer briefly transporting two men suspected of a violent crime, did not exceed the restraint reasonably necessary to accomplish quickly the purposes of the detention." (*Id.*, at p. 385; *United States* v. *Bautista* (9th Cir. 1982) 684 F.2d 1286, 1289 [handcuffs were reasonably necessary to detain a nervous suspect who paced back and forth, as if thinking about running], cert. den. (1983) 459 U.S. 1211 [75 L.Ed.2d 447, 103 S.Ct. 1206].) In *People* v. *Bowen* (1987) 195 Cal.App.3d 269 [240 Cal.Rptr. 466], also an identification case, handcuffing a suspect to a guardrail for 25 minutes while police waited for the victim to arrive did not elevate a detention into an arrest. (*Id.*, at pp. 272-274.)

 Here, defendant struggled violently with the officers for five minutes. The need for handcuffing during questioning was patently justified by concern for officer safety. "The handcuffs eliminated the possibility of an assault or escape attempt during the questioning, particularly if an arrest became imminent." (*United States* v. *Bautista, supra*, 684 F.2d 1286, 1290.)

Upon bringing defendant to a standing position, handcuffs in place, the officers were finally able to carry out an investigation. Before doing that,

---

[3]Defendant relies on Penal Code section 835, which states: "An arrest is made by an *actual restraint of the person*, or by submission to the custody of an officer. The person arrested may be subjected to such restraint as is reasonable for his arrest and detention." (Italics added.) He implies that a state statutory definition of "arrest" can alter *constitutional* distinctions between detention and arrest. No authority is cited, and we know of none.

however, Officer Dinslage saw something in defendant's mouth, starting the one-minute-long control-hold struggle. While the officers up until then had only seen defendant move his hand to his mouth *as if* placing suspected rock cocaine into it, Dinslage's actual observation of something in the mouth cinched the existence of probable cause on the total facts. (*People* v. *Cappellia* (1989) 208 Cal.App.3d 1331, 1336, 1338 [256 Cal.Rptr. 695]; *U.S.* v. *Caldera* (9th Cir. 1970) 421 F.2d 152, 153.) By then defendant had fled up the hallway steps in response to the uniformed officers' justified command to come down. (Cf. *United States* v. *Lane* (6th Cir. 1990) 909 F.2d 895, 898-900 [detention proper when suspects fled through apartment hallways when uniformed police entered in response to anonymous phone tip of drug activity there].) His running off in response to a proper command, plus other factors, makes this a far cry from innocently avoiding police. (Cf. *People* v. *Aldridge* (1984) 35 Cal.3d 473, 479 [198 Cal.Rptr. 538, 674 P.2d 240]; *People* v. *Bower* (1979) 24 Cal.3d 638, 647-648 [156 Cal.Rptr. 856, 597 P.2d 115]; *People* v. *Holloway* (1985) 176 Cal.App.3d 150, 153-155 [221 Cal.Rptr. 394].)

Probable cause supports the recovery of cocaine from defendant's mouth (*People* v. *Cappellia, supra,* 208 Cal.App.3d 1331, 1336) and, of course, justifies the one-minute struggle as a full arrest, making it unnecessary to analyze it as a mere detention.

## III

Defendant lastly contends that the officers used excessive force—choking—to get the cocaine from him. We uphold the municipal court's express contrary conclusion that no choking occurred.

Police use of excessive force which shocks the conscience violates due process of law. (*People* v. *Bracamonte, supra,* 15 Cal.3d 394, 399, citing *Rochin* v. *California* (1952) 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396].) Also, a search may by virtue of its intolerable intensity and scope violate the Fourth Amendment. (*People* v. *Bracamonte, supra,* 15 Cal.3d at p. 400.)

"The police may, in order to prevent the destruction of evidence, reach into a person's mouth to recover evidence if there is sufficient probable cause to believe a crime is being, or has been, committed. . . . The mouth is not a 'sacred orifice' and 'there is no constitutional right to destroy or dispose of evidence . . . .' . . ." (*People* v. *Cappellia, supra,* 208 Cal.App.3d 1331, 1336, citations omitted.) Thus, "attempts to swallow evidence can be prevented [citations] as long as excessive force is not employed. [Citations.]" (*People* v. *Bracamonte, supra,* 15 Cal.3d 394, 405,

fn. 6.) However, *choking* someone to recover evidence violates due process, without any need to inquire into the precise degree of choking involved. (*People* v. *Jones* (1989) 209 Cal.App.3d 725, 730 [257 Cal.Rptr. 500].)

Whether a choking occurred is a question of fact for the lower court to resolve and its finding must be upheld if supported by substantial evidence. (*People* v. *Jones, supra,* 209 Cal.App.3d 725, 730-731.) Here, the finding was of *no* choking and the evidence, viewed favorably to that finding, supports it.

The two witnesses gave irreconcilably divergent accounts. Officer Danker said he had defendant in a control hold from behind, the crook of his arm placed in front of the neck to avoid choking, while Officer Dinslage used one or both of his hands at defendant's *jaw or lower face* (not neck) in an attempt to retrieve the cocaine. The apartment resident, Ms. Williams, recounted an officer holding an apparently handcuffed defendant against the wall by squeezing his *Adam's apple area* with one hand while a second officer just stood by, hands at his sides. Williams only saw about five or six seconds of the incident, but it was reasonable for the judge to find that she witnessed part of the same one-minute struggle during which the officer said he applied the control hold. Defendant had his hands behind his back (impliedly in handcuffs) and was making gagging noises like the ones Danker described. Thus, the court had to resolve a conflict and impliedly did so in favor of the officer's testimony, which he found to be "believable." The judge did say he found Williams's testimony "also believable," but we take that to mean only that he thought she was truthful or, perhaps, that either witness's account, standing alone, was plausible. The court could not reconcile *both* and impliedly accepted the officer's, rejecting Williams's account of choking.

Defendant points to the facts of *People* v. *Jones, supra,* 209 Cal.App.3d 725, where choking was found when an officer pressed his thumb into the underside of the defendant's jaw, above the Adam's apple. (*Id.,* at p. 727.) However, there was no such testimony in this case—only that Officer Dinslage "grabbed the lower jaw, below the lower jaw, and requested and tried to get the jaw to open up." Dinslage was squeezing or "[c]lenching" the jaw, not pressing into the throat below it. *Jones* was also a case where the Court of Appeal upheld, with due deference, a finding that there *was* choking. (*Id.,* at p. 728.) Deference here is in favor of a *no*-choke finding and, as in *Jones,* special respect is due the factfinder's "benefit of . . . observing a re-creation of the neck hold used by the officer" (*id.,* at p. 731).

The only suggestion of choking in Officer Danker's testimony was that defendant "was gagging" during the struggle. It is true, as defendant notes, that one definition of "gag" is "choke." (Webster's New Internat. Dict.

(3d ed. 1965) p. 928.) Still, assuming that the court accepted that testimony, it was not bound to find illegality. Defendant struggled throughout the minute-long episode; Danker recalled, "I was trying to keep my balance the whole time." Given this great exertion and the upward position into which the control hold forced defendant's head, it is not surprising that he made "gagging" sounds. We also bear in mind that he was fighting to keep a chunk of rock cocaine in his mouth, an object which could cause obstruction independent of the officers' actions. Also, when he finally expelled the rock, still in the control hold position, it "came flying out of [his] mouth," which suggests that his airway was not otherwise obstructed. (Contrast *People* v. *Jones, supra,* 209 Cal.App.3d 725, 728 [suspect expelled balloon only as he was forced to the ground by pressure to the back of his neck].) Thus, substantial evidence supports a no-choke finding despite the "gagging" testimony.

DISPOSITION

The judgment is affirmed.

Kline, P. J., and Benson, J., concurred.