DECISION.
{¶ 1} The defendant-appellant, George Burnett, appeals from the order of the trial court denying his motion to suppress physical evidence following his indictment for possession of cocaine. After the trial court's ruling, Burnett pleaded no-contest to the offense and received an eleven-month sentence with credit for the twenty-seven days that he had previously served. In his four assignments of error, he challenges the constitutionality of his initial encounter with the police and the subsequent search of his person that resulted in the seizure of the physical evidence.
 {¶ 2} For the following reasons, we affirm.
 FACTS {¶ 3} Sergeant David Johnston testified that he was patrolling downtown Cincinnati on February 4, 2004, when a resident of the area flagged down his vehicle and reported a suspicious person walking back and forth along Mound Street "three or four times" while "looking into car windows." Johnston testified that he stayed in the car while tracking the citizen on the sidewalk until the citizen pointed out Burnett and shouted, "That's him. That's him right there."
 {¶ 4} Johnston described Mound Street as "a residential area that has townhouses." He stated that the street was "subject to a lot of thefts from autos," as well as breakings and enterings, "and things to that effect." Asked to characterize the illegal drug activity in the area, Johnston replied, "There is — I think it's — there's not a lot of drug activity, per se, on that section of Mound Street."
 {¶ 5} According to Johnston, he drove up alongside Burnett and said, "Hey, can I talk to you for a second?" Johnston stated that Burnett stopped and was "very cooperative." Johnston explained that a citizen had identified him, Burnett, as a person looking into cars, to which Burnett replied that he was merely passing through the neighborhood. Johnston testified that he then asked Burnett "if he had anything on him, any weapons." Johnston stated that Burnett responded negatively and then gave Johnston consent to pat him down. Johnston testified that he patted down Burnett's waistband area for weapons but did not go through Burnett's pockets. He testified that he found nothing.
 {¶ 6} Johnston stated that he then asked Burnett whether he had any open warrants, to which Burnett responded negatively. Wanting to confirm this on his car computer, Johnston then asked for Burnett's birth date, which, he testified, Burnett freely gave him. Johnston testified that he then said to Burnett, "Well, I'm going to check you on the computer real quick." He described how Burnett "just sat down on the sidewalk" to wait. Meanwhile, according to Johnston, another officer had arrived on the scene. He testified that Burnett was not handcuffed.
 {¶ 7} According to Johnston, as he was waiting for a response from the computer, he looked over at Burnett and noticed that he was turning his head and "spitting something out of his mouth." He stated that the projectile was white and "looked like a piece of tooth." He stated that Burnett's spitting the object out of his mouth "didn't immediately register" and that he turned back to the computer, but when he looked back toward Burnett a moment later he noticed for the first time that he appeared to be concealing something in his mouth.
 {¶ 8} By that time, Johnston testified, a couple of other police cars had arrived on the scene. One of the new officers apparently also noticed that Burnett appeared to be concealing something in his mouth. Johnston testified that he and his fellow officers asked Burnett to stand up, to come over to one of the patrol cars, and to show or tell them what he had in his mouth. He stated that Burnett replied that he had been punched, an explanation which he, Johnston, did not believe because Burnett had failed to mention anything of that nature when they were first talking. At that point, Johnston testified, he was convinced that Burnett was concealing something in his mouth large enough to affect his speech.
 {¶ 9} Johnston testified that he repeatedly asked Burnett to spit out whatever was in his mouth. Asked upon direct examination whether he had any idea what was in Burnett's mouth as he tried to get him to open his mouth or spit the object out, Johnston replied, "No." But on cross-examination, Johnston testified, "All I was focusing on was him getting the substance out of his mouth. It was obvious he was concealing something in his mouth, and from my experience from my ten years on thepolice department, I assumed it was some kind of contraband and probablydrugs." (Emphasis supplied.)
 {¶ 10} When Burnett refused to divulge what was in his mouth, Johnston testified that he and his fellow officers grabbed hold of Burnett and, with one officer holding each arm, bent him over the police car and threatened to spray him with Mace unless he spit the object out. According to Johnston, "One of the officers wanted to Mace him fairly quickly, but I wanted to give him the opportunity to spit it out. And normally, if somebody was concealing something in their mouth, they're sprayed with chemical irritant almost immediately, but I wanted to give him the opportunity to spit it out of his mouth."
 {¶ 11} Burnett eventually spit the object out of his mouth. According to Johnston, the object appeared to be a baggy of crack cocaine and Burnett was then handcuffed and put in the back of one of the police cars. He stated that he believed Burnett said that the object or substance was crack cocaine, but that such a statement, if it was made, was not in response to any official questioning.
 {¶ 12} Burnett testified at the hearing as well. He stated that during his initial exchange with Johnston he did not feel threatened and responded to his questions because he felt that "it was in my interest just to tell him and be cooperative because I knew I wasn't wanted and I knew I committed no crime." He stated that he freely gave Johnston his driver's license to facilitate the computer check to see if he had any open warrants.
 {¶ 13} He described next how he was handcuffed and bent over the police car when the officers noticed that he had something in his mouth. He testified that one of the officers said to him, "I'm going to slam your goddamn head on this car and I'm going to take you to jail and I'm going to Mace you if you don't spit that shit out of your mouth." At that point, he testified, he felt that he was in imminent harm and told him himself to "just spit a piece of tooth out." He stated that whatever statements he may have made to the police afterward were made withoutMiranda warnings, and that in any event he could not recall making any statements.
 The Trial Court's Findings {¶ 14} The trial court granted that part of Burnett's motion seeking to suppress his alleged statement that the object or substance that he spit out of his mouth was crack cocaine. The court ruled that this statement was made while Burnett was in custody but before he had been read his Miranda rights.
 {¶ 15} But with respect to the physical evidence, the trial court overruled the motion. The court first determined that Johnston had a reasonable, articulable suspicion that allowed him to stop Burnett for questioning. The court further found that Burnett had responded to Johnston's subsequent questioning voluntarily, and that Johnston's brief pat-down search of Burnett for weapons was proper. Next, the court determined that, under the totality of circumstances, Johnston and his fellow officers had probable cause to believe that Burnett had drugs in his mouth when they saw him attempting to conceal an object in his mouth large enough to have affected his speech, causing him to mumble. And finally, the court concluded that Burnett's refusal to voluntarily spit out the object or substance, and the fact that he could have swallowed it, presented exigent circumstances justifying the measures that the police took to persuade him to disgorge the object.
 Standard of Review {¶ 16} In Ornelas v. United States (1996), 517 U.S. 690, 699,116 S.Ct. 1657, the United States Supreme Court held that, "as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." The court then set forth a two-step inquiry. The first step is actually not de novo, since it requires that we review the trial court's findings of historical fact "only for clear error, `giving due weight to inferences drawn from those facts by the trial court.'" Id. The second step involves what is purely a question of law and is genuinely de novo, however. That step requires that we determine, without any deference to the trial court, whether the historical facts, viewed from the standpoint of an objectively reasonable officer, justified the detention. Id. at 696, 116 S.Ct. 1657.
 Analysis {¶ 17} In his first and second assignments of error, Burnett argues that the trial court erred in concluding that Johnston had reasonable suspicion to initially stop and ask him questions after a citizen identified him as the person walking up and down the street several times, looking into car windows. In support of this position, he points to the fact that no actual crime had been reported, that it was broad daylight when he was stopped, and that none of his movements or mannerisms in Johnston's presence were in any way suspicious.
 {¶ 18} In response to Burnett's argument that no crime had occurred, we hasten to point out that it is not necessary, to justify a stop underTerry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, that any criminal activity have actually taken place. Indeed, the defendants in Terry had not broken any law but were doing nothing more than loitering on a corner in front of a bank. To effectuate a Terry stop, it is only necessary that the police have a reasonable, articulable suspicion that criminal activity is afoot.
 {¶ 19} In a neighborhood with a high incidence of car break-ins, a stranger walking down the street, stopping to look through car windows is, by any objective measure, suspicious. Suffice it to say that the average person, even the morbidly curious, does not go about peering into the interiors of other people's cars, one after another along a street — several times. And, as this court has previously held, a police officer may act upon a tip of a citizen informant who has viewed the suspicious activity first-hand and remains in contact with the police. See State v.Gatewood (Dec. 22, 2000), 1st Dist. No. C-000157.
 {¶ 20} Although we have no quarrel, therefore, with the court's finding that Johnston's initial encounter with Burnett was prompted by reasonable suspicion, we agree with the state in its brief that, up until the time the officers took measures to force Burnett to spit out the object in his mouth, there was no "stop" in the Terry sense. Both Johnston and Burnett testified that the encounter was completely consensual. Johnston testified that he approached Burnett and asked if he could talk to him, and that Burnett was "very cooperative," agreeing to be patted down and voluntarily showing him identification with his birth date. Burnett, significantly, did not dispute Johnston's characterization of the encounter, testifying that he did not initially feel threatened and freely cooperated with the officer because he believed that he had committed no crime and had nothing to hide. During the period of the initial encounter, Burnett was not handcuffed and apparently willingly sat and waited while Johnston ran his identification through the computer.
 {¶ 21} As the Ohio Supreme Court noted in State v. Taylor (1995),106 Ohio App.3d 741, 747-748, 667 N.E.2d 60, "Encounters are consensual where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away. * * * The request to examine one's identification does not make an encounter nonconsensual. * * * Nor does the request to search a person's belongings. * * * The Fourth Amendment guarantees are not implicated in such an encounter unless the police officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter." (Citations omitted.)
 {¶ 22} In his third assignment of error, Burnett argues that the trial court erred by finding that the police had "reasonable suspicion" to place him into custody. This assignment miscasts the argument, however, because, at the point at which Johnston and his fellow officers did restrain Burnett's liberty, once they became aware of the bulge in his cheek, the trial court found that they possessed probable cause, not reasonable suspicion, to believe that he had illegal drugs in his mouth.
 {¶ 23} Burnett's argument is transposable to the issue of probable cause, however. He contends that having something in his mouth, speaking in a muffled voice, and earlier spitting out something that may have been a tooth — all in broad daylight and in an area not known for a high degree of drug activity — did not give rise to "reasonable suspicion" (and hence probable cause). We disagree.
 {¶ 24} Granted, under other circumstances, a citizen may have a bulge in his cheek without suggesting anything criminal. The police may not go willy nilly down the street ordering people to spit things out of their mouths. But under these circumstances, the bulge was more than just a bulge. Significantly, Burnett did not have the bulge when Johnston first encountered him on the street. He spoke normally. Only after Johnston had turned his back on him, to check his identification on the car computer, did the bulge suddenly appear. Having had no problem speaking before, Burnett's voice mysteriously became muffled due to the large, cumbersome object now pressed against his cheek. Then, when asked about the bulge, Burnett mumbled an answer, that he had recently suffered a punch (and was apparently experiencing an unusual case of delayed and yet sudden, massive swelling). Not having seen any earlier evidence of such a blow, and already suspecting him of criminal activity, Johnston reasonably concluded that Burnett was lying to conceal from him whatever was in his mouth. At this point, Johnston testified, based upon his experience as a police officer, he concluded that Burnett had stored drugs or other contraband in his mouth while he had his back turned.
 {¶ 25} As for Burnett's argument regarding the spit tooth, if ever there was a tooth actually spit (few of us, it should be pointed out, are capable of spitting out a tooth whenever we want), it was apparently spit for naught. Johnston's testimony made clear that he did not even react to the mysterious projectile. His and the other officer's reactions were clearly to the bulge in Burnett's check and the contraband it presaged.
 {¶ 26} In his fourth assignment of error, Burnett finally tackles the issue of probable cause, again arguing that one spit tooth does not constitute grounds for arrest. But again we must make the point that the record does not support the conclusion that the officers were reacting to whatever he spit out. They were reacting to what he would not spit out.
 {¶ 27} Also under his fourth assignment of error, Burnett challenges the trial court's conclusion that exigent circumstances existed, allowing the officers to, in effect, search his oral cavity without a warrant. In this regard, he points to the lack of evidence in the record that he was going to swallow whatever was in his mouth, or, as he puts it, "no attempts to gulp" or to chew "in preparation for swallowing." He proposes that since he was answering the officer's questions, he could not physiologically have swallowed since "[a] person cannot swallow and speak at the same time."
 {¶ 28} Granted Johnston may have not testified that he ever saw Burnett on the verge of swallowing. But any police officer is aware that drugs often are ingested to protect them from seizure. And presumably those about to conceal drugs by ingestion in front of police officers do not do it in stages, or stop and announce their intent before swallowing, giving the police fair warning in case they want to try to stop them.
 {¶ 29} Burnett neglects to make the one argument left to him, which is that although Johnston and his fellow officers may have properly searched him, they did so by using unreasonable force to get him to open his mouth. As will be recalled, Johnston testified that the officers held Burnett's arms while bending him over the police car, threatening him that they would spray him with Mace unless he spit out whatever was in his mouth. (Indeed, Johnston testified that normally suspects are sprayed with Mace "immediately" under such circumstances.) Burnett testified that he was further threatened by one of the officers, who told him that he was going to "slam [his] goddamn head on this car" unless he spit out the object.
 {¶ 30} Having reviewed the case law, we note that courts seem generally to find searches of a suspect's mouth reasonable despite the use of some level of force or coercion, including, in one case, the actual spraying of Mace or pepper spray. See United States v. Holloway
(Kan. 1995), 906 F. Supp. 1437, 1442-1443 (discussing cases). "Inasmuch as the mouth is not a sacred orifice and there is no constitutional right to destroy or dispose of evidence, attempts to swallow evidence can be prevented [citations omitted] as long as excessive force is not permitted." People v. Bracamonte (1975),15 Cal.3d 394, 405-406, 540 P.2d 624. Choking, it should be pointed out, is usually considered excessive force, no matter what the degree. SeePeople v. Johnson (1991), 231 Cal.App.3d 1, 282 Cal.Rptr. 114.
 {¶ 31} The test for excessive use of force under the Fourth Amendment is one of reasonableness. Graham v. Connor (1989), 490 U.S. 386, 395,109 S.Ct. 1865. The test is an objective one, focusing on the officers' actions, not with the vision of hindsight, but in light of the facts and circumstances confronting the officers at the time. Id. at 396-397,109 S.Ct. 1865. Here, the officers' use of force and threatened force, which escalated only after Burnett refused to spit out the object or substance, was not excessive for the purposes of the Fourth Amendment and, given that the threats of more dire measures were never carried out, does not shock our consciences. See Rochin v. California (1952),342 U.S. 165, 72 S.Ct. 205. It should be noted that one element for consideration in these cases is that if the police do not act quickly and forcefully enough there is always the possibility that the suspect will swallow the drugs and either choke or succumb to a dangerous accidental overdose. See Holloway, supra, at 1443.
 {¶ 32} Accordingly, finding no error in the trial court's denial of the motion to suppress physical evidence, we affirm the judgment below.
Judgment affirmed.
Gorman, P.J., Painter and Sundermann, JJ.