[No. H010766. Sixth Dist. May 12, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
BONSET SOUN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*\*Pursuant to California Rules of Court, rule 976.1, the part of the opinion from its beginning through the sentence "The seizure of Soun's person did not violate the Fourth Amendment" (immediately before the heading "Motive"), and the last sentence of the opinion ("The judgment of conviction is affirmed"), are certified for publication.*

1502

COUNSEL

Michael A. Kresser, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias, David D. Salmon, Richard Rochman and Linda Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BAMATTRE-MANOUKIAN, J.—On Saturday, July 7, 1990, a shopkeeper named Chan Khun was shot and killed in his San Jose video store. Within 36 hours Bonset Soun had been identified as the gunman, had given a detailed confession, and had directed police to the rifle he had used. Soun was found guilty of first degree murder in the attempted commission of robbery (Pen. Code, §§ 187, 190.2, subd. (a)(17)(i)) and two other felonies, and was sentenced to life in prison without possibility of parole. On appeal Soun does not question the sufficiency of the evidence admitted at trial to prove that he killed Khun. He argues:

(1) That the trial court improperly denied his motion to suppress much of the evidence against him on the ground that the procedures by which he was detained or arrested were illegal and that the evidence had been the fruit of the illegality;

(2) That the trial court erroneously excluded proffered evidence that his motive to kill Khun had been something other than robbery;

(3) That his self-incriminatory statement to a juvenile hall counselor should have been excluded on the ground it had been elicited in violation of his Fifth and Sixth Amendment rights; and

(4) That the trial court erroneously refused to conduct a second hearing as to whether Soun was under the age of 18 years when he killed Khun.

We have concluded that none of Soun's assertions warrants reversal and that the judgment of conviction should be affirmed. We shall publish only our discussion of Soun's first assertion.

The basic facts are essentially undisputed.

Soun (a young Cambodian) and five other Asian youths drove from Oakland to San Jose, on Saturday morning, in response to an acquaintance's request that they rob a gambling establishment for him. Their vehicle was a blue 1981 Toyota two-door sedan owned by one of Soun's confederates. Soun owned a rifle, and took it with him in the Toyota.

Once in San Jose, the six learned that the gambling establishment would not be a feasible robbery target and shifted their attention to Khun's video shop. They parked near the video shop and "cased" it, by entering the shop and asking Khun (also a Cambodian) if he had videotapes of a specified kind while looking for such details as whether the shop had surveillance cameras. A short time later, about 3:30 Saturday afternoon, Soun and three of his confederates reentered the store while the other two remained outside to serve as lookout and driver. Soun had loaded his rifle and took it with him into the shop; he later explained to police that he needed to be ready to shoot the shopkeeper should the shopkeeper have a gun of his own. Khun did not have a gun. The four youths demanded Khun's jewelry and money; when Khun professed reluctance and perhaps skepticism, Soun shot Khun three times in the chest. The four then ran from the shop, apparently without taking anything, and the six left the area in the blue Toyota. Soun initially rode in the trunk of the Toyota; on the freeway en route back to Oakland the driver stopped and Soun moved to the passenger compartment.

By shortly before noon Sunday, July 8, 1990, Oakland police had found the blue Toyota, parked on an Oakland street, and were watching it. Within a few minutes Soun and his five confederates entered the car and began to drive away. They were stopped by Oakland police; San Jose police conducted interrogations, obtained detailed confessions from Soun and several of his confederates, collected additional evidence including the murder weapon, and filed charges against all six.

Several days later, while Soun was being held in juvenile hall, he told a counselor that "he was here for killing somebody, and that he had done it for a friend who needed money for a car . . . ."

The juvenile court subsequently determined that Soun had been an adult at the time he killed Khun. Three of Soun's five confederates were minors, who ultimately admitted the truth of Welfare and Institutions Code section 602 petitions filed against them in juvenile court; the other two pled guilty in adult criminal proceedings. Only Soun went to trial. The prosecutor elected not to seek the death penalty. A jury found Soun guilty of conspiracy to commit robbery, attempted robbery, and first degree murder in the commission of attempted robbery, with enhancements for personal use of a firearm. Soun appeals from the ensuing judgment of conviction.

*The Apprehension*

Soun argues that in seizing his person, transporting him to police headquarters, and holding him there for several hours the police violated the Fourth Amendment, that the violation tainted significant prosecution evidence assertedly attributable thereto, and that under the case law all such evidence should have been suppressed.

Soun first moved to suppress the evidence, under Penal Code section 1538.5, during the preliminary examination. The magistrate denied Soun's motion. Soun renewed his motion in the trial court, which denied Soun's motion to present evidence in addition to the preliminary examination transcript. (Cf. Pen. Code, § 1538.5, subd. (i).) The renewed suppression motion was submitted on the transcript alone, and the trial court denied the motion. ■ In this court we review the magistrate's explicit or implicit factual findings directly, to determine whether the findings were supported by substantial evidence (*People* v. *Ramsey* (1988) 203 Cal.App.3d 671, 679 [250 Cal.Rptr. 309]; cf. *People* v. *Bishop* (1993) 14 Cal.App.4th 203, 214 [17 Cal.Rptr.2d 657]); we then exercise our independent judgment to determine whether, on the facts found, the seizure of Soun's person was unreasonable within the meaning of the Constitution. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 597 [174 Cal.Rptr. 867, 629 P.2d 961]; cf. *People* v. *Ramsey*, *supra*, 203 Cal.App.3d at p. 679.)

So far as relevant to Soun's Fourth Amendment argument, the preliminary examination transcript reflects the following evidence.

Khun's video store faced Fair Avenue near its intersection with McLaughlin Avenue.

A witness named Hailu was working at a liquor store, on McLaughlin around the corner from the video store, on Saturday afternoon. At some time after 3 p.m. Hailu noticed a two-door blue "Japanese" car, with five to six

male people associated with it, parked in an unusual way in the liquor store's parking area: the car was backed against the fence between the liquor store and the video store. When Hailu saw the car its trunk was open and all of the five or six people were standing around the trunk. Hailu was "80 percent sure they were Cambodians; 100 percent sure they were Asians." Hailu was concerned that they might have stolen property, or in any event that "something wrong was going on." As Hailu looked out, they closed the trunk. He yelled to them to "leave the parking lot," and they got into the car and drove off to the left, toward Fair. Later in the day Hailu was interviewed by the police detectives assigned to the homicide investigation, Sergeants Robinson and Escobar; Hailu acknowledged that he may have told them he saw only three or four males get out of the car.

A witness named Alcontar was driving his car on Fair, and had stopped at McLaughlin, at 3:30 p.m. on Saturday. Alcontar heard what he characterized as "two gunshots," or possibly three, from his right. He looked to his right and saw "five kids," whom he described as Asian and probably Vietnamese males between twelve and eighteen years of age, running from the area of the video store toward a car parked near Fair. Alcontar believed he saw the "kids" carrying two weapons, one of which he described a "short and square" automatic weapon and the other as a rifle. He also testified he saw "one for sure," and that it was the rifle, carried by what appeared to be the oldest and second-tallest of the "kids." Alcontar testified that the car's doors and trunk were open, and that he saw another person standing near the car. The "kids" got into the car which drove off away from Alcontar, and from McLaughlin, along Fair. Alcontar made his intended left turn on McLaughlin and continued toward his destination; the car he had seen apparently went around one or more blocks and pulled in ahead of Alcontar on McLaughlin. The two cars proceeded together to Story Road and then along Story Road to the point at which it intersects Highway 101. Along the way Alcontar seized a piece of paper and a pencil and wrote down the car's license number: he was confident of the first part of the number but not of the order of the last three digits. The number he wrote down was 1RCS525; it was the 525 of which he was unsure. Alcontar told the police that the car was maroonish or reddish in color. He testified at preliminary examination that the car was dirty and that it was "a short, a little, small foreign car" which "could have been an either Toyota or something small and square." He acknowledged he told the police it was a two-door car. The car, with what appeared to Alcontar to be five occupants, turned on the ramp to northbound Highway 101, which intersects Highway 880, the principal route from that area to Oakland, a short distance farther north. Alcontar continued on Story Road. Alcontar was interviewed by Sergeants Robinson and Escobar later that day, gave them the number he had written down, and told them the last three

digits could have been "583 or something like that." Alcontar also told them that one or two of the "kids" had worn baseball caps "on backwards" and that one of the caps was "red . . . , possibly a 49er type."

A witness named Kim was at work at a market on Fair, next door to the video store, on Saturday afternoon. About 3:30 p.m. he heard "two loud noises." He looked outside and saw "three to four, four to five" Asian males running from the area of the video store toward the corner of the parking area. The Asians appeared to be 18 to 20 years old, and one of them was carrying a gun. When he saw the gun, Kim ran to the video store, where he saw the owner lying on his back behind the counter, shot in the chest. Kim went back to his store and called 911; he was told the police had already been called, and in fact they arrived while he was on the telephone.

A witness named Durgin was at the Alano Club, on Fair beyond the market from the video store, on Saturday afternoon. He heard what he described as "four hammers or four pounds with a hammer," which were "very hard sounds." Initially he "had no idea it was gunfire." He went to a window and saw four men taking a diagonal path across a parking lot from the area of the video store and market toward an opening between two fences, one of which separated the Alano Club from the market and the other of which paralleled Fair. It was Durgin's impression that the men were not running but "kind of walking with a purpose or direction or a goal." Durgin could see a car beyond the fence which paralleled Fair and backed up to it; he believed the car was blue. The men "looked like Mexican, but they were Oriental. [¶] . . . [¶] [T]heir skin color wasn't what I expected from Oriental and their eyes weren't what I expected from Mexicans." According to Durgin, the tallest of the men—he appeared to Durgin to be "real" or "inordinately" tall—was carrying "what looked like a pump-action type weapon of some kind." The same man was wearing "a black or navy blue type baseball cap, kind of reminded me of the Oakland Raider's cap." The other three men were shorter, including "a real tiny, tiny guy in the back." It was Durgin's impression that the men put something in the car trunk before they drove away. He did not get a license plate number. Durgin reported his observations to the police within a few minutes after he made them. At preliminary examination he acknowledged that he may have told the officers he believed the car was a Volvo "or that type of car, little runny cars, . . . little dinky cars." "[J]ust a boxy type of car . . . ."

A San Jose police officer named Helder was the first officer to reach the scene; he heard the call at 3:42 p.m. As he arrived at the video store he noticed two individuals standing outside, one of whom handed Helder a piece of cardboard on which was written a partial license number 1RC_538

and the words "blue car, four people, young." By approximately 3:50 p.m. Helder had broadcast this information, together with his observations that there appeared to have been a robbery and that the victim was dead.

A witness named Crown testified that about 3:50 p.m. on Saturday he had been on the exit ramp from northbound Highway 101 to northbound 880, the route to Oakland from that area, when he saw a blue Toyota Cressida or Camry parked on the side of the ramp. "[I]t was a four-door, and the back door was open. [¶] And there was an individual with a large, what I believed to be a semi-automatic rifle in his hands running around toward the rear of the car on the passenger side." Crown saw at least two other people in the car. All of the people he saw were male Asians. Crown was unable to get a license plate number. He reported what he had seen to the highway patrol; San Jose police contacted him shortly thereafter and he discussed the case with them, telling them among other things that the individual with the gun had been about 5 feet 10 inches tall and in his 20's or younger.

At San Jose police headquarters an officer named Kranich was on duty on Saturday; one of his duties was to monitor the computer system. As the information we have summarized was received, it was forwarded to Kranich's computer terminal. Kranich noticed the physical descriptions and the variations in license plate numbers reported by witnesses. Moving to a computer terminal with access to the Department of Motor Vehicles database of vehicle license plate numbers, Kranich ran the numbers as reported. Having received no match consistent with the described vehicle, Kranich "decided to begin trying some combinations, variations on the plate number reported by the witnesses to see if I could find a better match." He began to enter variations of the three reported license plate numbers of which he was then aware: 1RC_538, 1RCS585, and 1RCS525. He perceived that there was no conflict among the versions as to the letters RCS; he concentrated on the last three numeric characters. Concluding that 5's and 8's predominated, and attempting to allow for the impact of a "human emotion factor" on "visual perception," Kranich decided to try various combinations of numeric characters 5 and 8. On about the fifth or sixth combination which the Department of Motor Vehicles (DMV) computer could link to a registered vehicle, Kranich got a 1981 Toyota registered to one Chantha Nhim at an address on Martin Luther King Way in Oakland. Vehicle color is not included in DMV computer records. Kranich knew from his own experience that the area in which Khun had been killed had a large Cambodian and Vietnamese population. The matchups of vehicle type and a surname which was "possibly of that same ethnic group," together with an address in Oakland toward which the vehicle had inferably been headed at last report, led Kranich to consider this "a very likely candidate for further investigation"; none of his other

combinations, including at least one additional combination which he ran after he got his "very likely candidate," had returned a vehicle "that was close to the make and model reported by the witnesses." Kranich acknowledged at preliminary examination that he did not undertake to assure that he had exhausted all possible combinations.

The combination that had matched Nhim's vehicle was 1RCS558. San Jose police put this number, with the DMV description and Nhim's name and address, on police computers at 4:40 p.m. Saturday, adding a notation to the effect that the identification was not yet firm. This communication was subsequently referred to as an "all points bulletin" or APB.

A police lieutenant named Seaman was the on-call officer in the San Jose police bureau of investigations on Saturday afternoon. He was called at home, went to the scene of the killing, and then went to the police department homicide unit where he arrived about 6 p.m. At that time Seaman received copies of the police computer printouts including the APB. About 6:30 p.m. Seaman called witness Crown and discussed what Crown had seen on the Highway 880 on-ramp. Although Crown believed the car he had seen was a blue Toyota, which corresponded with some other witnesses' descriptions of the car at the murder site, Crown also said that the Toyota was a late model (1989 or 1990), was a Cressida or a Camry, and had four doors. Nevertheless Seaman believed this might have been the car other witnesses had seen at the murder site, and that it might indeed have been headed toward Oakland. From DMV records Seaman was able to determine that Nhim's Toyota was the model known as a Corolla.

Seaman then called the Oakland police watch commander, a lieutenant named Williams. Seaman testified at preliminary examination that "I wanted to ask them to help us by going by the address of which the vehicle was registered to see if the vehicle was there so that we could determine whether it is in fact involved. [¶] . . . [¶] I told him that our department had an investigation going, that, on a homicide that had just occurred, where several Vietnamese or Asian males had gone into a store and shot a man, and that . . . [¶] . . . [¶] [t]hey were seen leaving the scene in a blue Toyota, and that another witness had told me it was seen on the on-ramp to northbound Highway 880, with a possible rifle, and I asked him if he would have a patrol unit go by the residence and tell me if the vehicle was there and to contact me if they did find the vehicle . . . ." Seaman's intent was to follow up from San Jose if the vehicle was found.

Williams promptly sent officers to the address on Martin Luther King; they did not find the described vehicle. Then Williams wrote the following "Interoffice Letter," dated on Saturday, to other watch commanders:

"Subject: 187 SUSPECTS AND VEHICLE/RE: San Jose P.D. Homicide Case

"Information from Lt. Seaman (S.J.P.D.-Homicide):

"At 1540 hrs. [Saturday], six male Vietnamese or male Orientals drove to a residence in San Jose, walked into the complaintant's house and shot him six times in the chest with a rifle. It is believed that the rifle used was a semi-automatic.

"Shortly after the shooting, a 1981 Toyota, possible license of 1RCS558 (unsure of numbers), headed N/B on 880 freeway from the 101 exchange in San Jose. Possible vehicle is registered to NHIN [sic], Chantha of 1925 MARTIN Luther King Way, Oakland. That address and sur[r]ounding area was checked for suspect vehicle by Third Watch officers with negative results.

"Lt. Seaman can be contacted at (408) 277-5283 until 2400 hrs. on [Saturday] and would like to be notified if the vehicle is in Oakland (requests that units take no action)."

During Saturday evening San Jose police received a statement from a witness who believed the vehicle had been "maroonish" and was a 1978 or 1979 Datsun 200SX.

Between 10 and 11 a.m. Sunday, an Oakland police sergeant named Sargent read Williams's letter to traffic division shift officers, including a motorcycle officer named Chew. Chew took a copy of the letter with him on patrol.

At approximately 11:40 a.m. Sunday Chew drove past the Martin Luther King Way address and saw the 1981 Toyota with plate number 1RCS558. The car was blue. Chew reported his discovery to Oakland police dispatch, asked that Sargent make a telephone call to San Jose police, and then took up a position from which he could watch the vehicle.

Sargent immediately called San Jose to talk to Seaman; the call was ultimately diverted to Sergeant Robinson who was not contacted until 11:55 a.m.

Meanwhile, at approximately 11:50 a.m., Chew saw three or more Vietnamese or Southeast Asian males come from the area of Nhim's address and get into the Toyota. Chew radioed to the dispatcher that "I'm gonna need some units out here, this 187 vehicle is about to roll." The Toyota pulled

away from the curb and traveled along Martin Luther King Way past Chew's position; Chew, who was in police uniform, followed it, and occupants of the Toyota turned to look at him. The Toyota then made several right turns, ultimately returning to and continuing past its point of origin on Martin Luther King Way. Meanwhile several police units had responded to Chew's call.

At approximately 11:52 a.m., while Chew was following the Toyota, Sargent asked the dispatcher to tell Chew "on the air to make it a traffic stop, only, if they make a stop." In subsequent testimony Sargent explained that he had in mind the distinction between a car stop for a perceived traffic violation, using lights and siren only and with no more than one backup vehicle, and a full-scale felony car stop with multiple police vehicles, guns drawn, and other procedures calculated to control a potentially dangerous situation. Sargent's concern, as he explained it, was that a full-scale felony stop would create traffic dangers and unnecessarily exacerbate a situation in which he did not yet have an indication of what San Jose wanted done.

The dispatcher agreed to forward Sargent's message but it appears that Chew did not receive it (and it is not clear that it was transmitted) before the Toyota was stopped. In any event Chew had decided upon, and by 11:55 a.m. he and his backup officers had executed, a full felony stop: they stopped the Toyota and, with guns drawn, ordered all of the occupants to get out of the car and to lie prone on the street where they were briefly pat-searched and then handcuffed. The stop involved several police officers and vehicles, and essentially closed Martin Luther King Way to other traffic. There were six young Asian males, including Nhim and Soun, in the Toyota.

San Jose police dispatch first contacted Sergeant Robinson, at home, at 11:55 a.m., as the Oakland officers were completing the stop of the Toyota. The dispatcher told Sergeant Robinson that "Oakland had a car stopped relating to our homicide" and asked permission to release Sergeant Robinson's home telephone number so that Oakland could call him directly.

An Oakland patrol sergeant named Fenton had responded to Chew's radio call for units; he arrived at the scene after the Toyota was stopped. When all six subjects had been handcuffed and placed in individual patrol cars, Fenton directed that the cars be moved to a nearby parking lot to wait for further instructions. Fenton then went to police headquarters, a short distance away, to find out what San Jose wanted done.

Between noon and 12:35 p.m., Sergeant Robinson and Fenton spoke twice by telephone. Sergeant Robinson wanted Fenton to describe, and to try to

identify, the subjects. Based on Fenton's descriptions, Sergeant Robinson concluded that Oakland police had in fact found the perpetrators of the San Jose murder. Sergeant Robinson asked Fenton to move the six subjects to Oakland police headquarters, with their consent if possible or by arrest if necessary, to wait for Sergeant Robinson and his partner to arrive from San Jose.

At approximately 12:37 p.m. the six subjects were moved to the homicide unit at Oakland police headquarters. At approximately 1 p.m. all of the subjects other than Soun were locked into separate interview rooms, and Soun was placed in a lieutenant's office which could not be locked but in which he was handcuffed to a chair. Sergeant Robinson and his partner arrived in the homicide unit at 3 p.m.; at 3:15 p.m. they secured Nhim's formal consent to a search of the Toyota; after examination of evidence and briefings by Oakland officers they began interrogating the subjects, one by one, at 4:50 p.m. The last interrogation in Oakland was concluded at 2:15 a.m. Monday; Sergeant Robinson and his partner then recovered the murder weapon from the home of one of the subjects. Throughout their stay at the Oakland homicide unit the six subjects were monitored regularly to assure that they were fed, made as comfortable as possible, and allowed to go to the bathroom as necessary. It appears, however, that none of the six subjects was afforded an opportunity to make telephone calls during this period.

At 4:30 a.m. Monday all the subjects were moved to San Jose.

 Having heard this evidence, the magistrate patently concluded that Soun's Fourth Amendment rights had not been violated. The magistrate appears to have reasoned:

(1) That insofar as the apprehension of Soun and his confederates may have amounted to no more than a temporary *detention*, it was sufficiently supported by evidence of an objectively reasonable suspicion that the subjects had been involved in criminal activity;

(2) That if and insofar as the apprehension may have amounted to an *arrest*, it was sufficiently supported by evidence of probable cause to arrest the subjects; and

(3) That the subjects had in any event effectively *consented* to be transported to Oakland police headquarters and to be held there pending interrogation by the San Jose detectives, and thus (in the magistrate's words) "everything that comes after that is going to be admissible."

We agree with the magistrate that the procedures by which Soun and his confederates were taken into custody satisfied the requirements of the Fourth

Amendment. Thus we need reach neither the issue of the subjects' asserted consent nor the question whether the various evidence Soun sought to suppress was attributable to the procedures by which he was taken into custody.

■ Any police restraint of the liberty of an individual either by physical force or by an assertion of authority to which the individual submits, in circumstances in which a reasonable person would have believed he or she was not free to leave, will constitute a state "seizure" of the individual within the meaning of the Fourth Amendment. (Cf. *California* v. *Hodari D.* (1991) 499 U.S. 621, 625-628 [113 L.Ed.2d 690, 697-698, 111 S.Ct. 1547]; *People* v. *Turner* (1994) 8 Cal.4th 137, 180 [32 Cal.Rptr.2d 762, 878 P.2d 521].) Such a seizure is normally characterized as either a "detention" or an "arrest." (*In re James D.* (1987) 43 Cal.3d 903, 911-912 [239 Cal.Rptr. 663, 741 P.2d 161]; *People* v. *Gentry* (1992) 7 Cal.App.4th 1255, 1266 [9 Cal.Rptr.2d 742].) The distinction can be significant, inasmuch as the constitutional standard for a permissible *detention* "is of lesser degree than that applicable to an *arrest*" (*People* v. *Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632], italics in original): A detention " 'may be undertaken by the police "if there is an articulable suspicion that a person has committed or is about to commit a crime" . . .' " (*In re James D.*, *supra*, 43 Cal.3d at p. 911, quoting *Wilson* v. *Superior Court* (1983) 34 Cal.3d 777, 784 [195 Cal.Rptr. 671, 670 P.2d 325]), while probable cause for arrest is said to exist only "when the facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that the person arrested is guilty of a crime." (*People* v. *Price* (1991) 1 Cal.4th 324, 410 [3 Cal.Rptr.2d 106, 821 P.2d 610]; cf. *People* v. *Harris*, *supra*, 15 Cal.3d at p. 389.) Thus in assessing the constitutional propriety of a seizure of the person it is essential initially to determine whether the seizure was a detention, or was an arrest, or was both a detention and, subsequently, an arrest.

■ The magistrate did not place this initial determination on the record of the preliminary examination, but as an integral part of our review we may infer a determination and assess whether the evidentiary record supports findings essential to that determination. Our review is simplified by the perception that there was no real dispute, on the preliminary examination record, as to most of the relevant facts.

Unquestionably Soun and his confederates were seized, in the Fourth Amendment sense, as soon as Chew and his backup officers stopped their car. Soun argues that from that moment he was under arrest, and therefore the seizure was constitutionally permissible only if the officers had

probable cause to arrest him. The Attorney General argues that at all relevant times the seizure was no more than a detention and thus subject to a lesser constitutional standard. We determine that the record supports a conclusion that Soun and his confederates were initially detained, and that the detention did not evolve into an arrest before the subjects were transported from the parking lot assembly area to Oakland police headquarters.

■ " 'Detentions' " have been summarily defined as " 'seizures of an individual which are strictly limited in duration, scope and purpose . . . .' " (*In re James D.*, *supra*, 43 Cal.3d at p. 911.) The term is often qualified by adjectives such as "temporary" or "investigative," but the terms are by no means self-executing: "Detentions may be 'investigative' yet violative of the Fourth Amendment absent probable cause. In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects. Nor may the police seek to verify their suspicions by means that approach the conditions of arrest." (*Florida* v. *Royer* (1983) 460 U.S. 491, 499 [75 L.Ed.2d 229, 237, 103 S.Ct. 1319]; cf. *In re Dung T.* (1984) 160 Cal.App.3d 697, 714 [206 Cal.Rptr. 772].) Patently the permissible purpose of a detention is to investigate the suspicion of criminal activity on which the detention was predicated: "[T]o permit a speedy, focused investigation to confirm or dispel individualized suspicion of criminal activity." (*People* v. *Gentry*, *supra*, 7 Cal.App.4th at p. 1267.) ■ "A brief stop of a suspicious individual, in order to determine his identity or *to maintain the status quo momentarily* while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." (*Adams* v. *Williams* (1972) 407 U.S. 143, 146 [32 L.Ed.2d 612, 617, 92 S.Ct. 1921], italics added; *People* v. *Johnson* (1991) 231 Cal.App.3d 1, 13 [282 Cal.Rptr. 114].) But "[t]he scope of the detention must be carefully tailored to its underlying justification. [¶] The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. [Citations.] It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." (*Florida* v. *Royer*, *supra*, 460 U.S. at p. 500 [75 L.Ed.2d at p. 238]; cf. *People* v. *Bowen* (1987) 195 Cal.App.3d 269, 273 [240 Cal.Rptr. 466]; *In re Dung T.*, *supra*, 160 Cal.App.3d at p. 715.)

██ Soun asserts that the Oakland police action was far too intrusive, and far too protracted, to be regarded as a detention. He points particularly to the evidence that he was removed from the car at gunpoint by a large number of police officers, was forced to lie on the ground, was handcuffed and placed in a patrol car, was transported from the site of the stop a distance of three blocks to a parking lot, and then was held at the parking lot for up to an additional thirty minutes, all without being told why he had been stopped or being permitted to communicate with his confederates.

None of the evidentiary factors Soun cites would necessarily require a conclusion that Soun had been arrested rather than simply detained. ██ Courts have, for example, declined in particular circumstances to base a finding of de facto arrest on evidence that the officers stopped the individual at gunpoint (*U.S.* v. *Alvarez* (9th Cir. 1990) 899 F.2d 833, 838-839), or required him or her to get out of a car (cf. *Pennsylvania* v. *Mimms* (1977) 434 U.S. 106, 109-111 [54 L.Ed.2d 331, 335-337, 98 S.Ct. 330]) and lie down on the pavement (*U.S.* v. *Buffington* (9th Cir. 1987) 815 F.2d 1292, 1300), or handcuffed him or her (*People* v. *Bowen, supra,* 195 Cal.App.3d at pp. 272-274; cf. *In re Carlos M.* (1990) 220 Cal.App.3d 372, 385 [269 Cal.Rptr. 447]; *U.S.* v. *Bautista* (9th Cir. 1982) 684 F.2d 1286, 1289-1290), or placed him or her in a police car (*U.S.* v. *Parr* (9th Cir. 1988) 843 F.2d 1228, 1231), or transported him or her for legitimate police purposes short of booking or custodial interrogation (*In re Carlos M., supra,* 220 Cal.App.3d at p. 385; cf. *Florida* v. *Royer, supra,* 460 U.S. at pp. 504-505 [75 L.Ed.2d at p. 241]; *People* v. *Harris, supra,* 15 Cal.3d at p. 390 [but transportation impermissible in the circumstances of record]), or held him or her for more than a minimal amount of time (*United States* v. *Sharpe* (1985) 470 U.S. 675, 686-688 [84 L.Ed.2d 605, 615-616, 105 S.Ct. 1568] [20 minutes]; *In re Carlos M., supra,* 220 Cal.App.3d at pp. 384, 385 [30 minutes]; *United States* v. *Place* (1983) 462 U.S. 696, 709-710 [77 L.Ed.2d 110, 122, 103 S.Ct. 2637] ["we decline to adopt any outside time limitation" (although 90 minutes would be too long in this case)]). "[T]here is no hard and fast line to distinguish permissible investigative detentions from impermissible de facto arrests. Instead, the issue is decided on the facts of each case, with focus on whether the police diligently pursued a means of investigation reasonably designed to dispel or confirm their suspicions quickly, using the least intrusive means reasonably available under the circumstances. [Citations.]" (*In re Carlos M., supra,* 220 Cal.App.3d at pp. 384-385; cf. *U.S.* v. *Baron* (9th Cir. 1988) 860 F.2d 911, 914 ["we consider the totality of the circumstances"].) ██ We turn to a consideration of all the circumstances of the Oakland car stop.

Because the nature of the police officers' reasonable suspicions was itself a circumstance relevant to our inquiry, it is important to consider, at the

outset, what a reasonable officer in the position of Chew and his colleagues would have suspected at the time of the automobile stop. Such a suspicion would have been based on a synthesis of information from two sources: the San Jose police communication (as relayed, with some inaccuracy as to details, by Williams's interoffice letter) and Chew's observations at the scene.

Williams's letter furnished all the information Chew had as he went to the field. From it a reasonable police officer would have suspected that, subject to verification of details, the described vehicle had been in some way involved in the shooting or with its perpetrators. Such an officer would also have understood that San Jose police were concerned with verifying the details and wished initially simply to find the vehicle.

Chew did find the vehicle and, in substantial compliance with the instructions relayed in Williams's letter, he simply reported the find and initially waited for direction while watching the car from a short distance away.

For whatever reason, Chew did not receive immediate direction. Approximately 10 minutes later he saw "several" (by which he meant "three or more") males, who appeared to be Vietnamese or Southeast Asian, come from in front of the address he had been given for Nhim and get into the car, which then pulled away from the curb. This was new information. Williams's letter had described the suspected assailants but had focused primarily on the car itself; on its face the letter neither contemplated nor provided for the possibility that three or more people who generally resembled the description of the six assailants would be seen using the car.

Chew's initial reaction was simply to follow the car while calling for backup police units. As he followed the car he made three additional observations: that there appeared to be *six* "Oriental[] or Vietnamese" males inside the car, a number that exactly matched the reported number of assailants, that the car's occupants repeatedly looked back at Chew, and that the car made a full circle and passed its point of origin. To a reasonable officer in Chew's position, these observations would have strengthened a suspicion that the occupants of the car were the assailants described in Williams's letter, both because the numbers corresponded and because the reactions of its occupants reflected concern at Chew's presence and a motivation either to evade him or at least to determine whether he was in fact following them.

Chew decided to stop the car. He was "concerned of the activity going on inside the vehicle, based on the information that I received earlier, that the

vehicle may have been involved in a homicide, and that the suspects were described as six Vietnamese male or Oriental males. And it appeared to be six male Orientals or Vietnamese inside the car, and that they were supposedly armed with a semi-automatic rifle, that concerned me. And I—at that time I made the decision to stop and detain the occupants of the car, fearing if I didn't at that point, there was a possibility of the car fleeing." He was also concerned that once the car was stopped the occupants might flee on foot.

In all these circumstances we cannot conclude that the means Chew chose to effect the detention elevated the initial detention to the status of a de facto arrest for Fourth Amendment purposes. Chew and his colleagues "were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." (*United States* v. *Hensley* (1985) 469 U.S. 221, 235 [83 L.Ed.2d 604, 616, 105 S.Ct. 675].) Chew concluded that to attempt to stop the car by means suitable to a simple traffic infraction—in the prosecutor's words, "just pull up alongside and flash your lights and ask them to pull over"—"would not be technically sound as far as my safety or safety of other officers."

We cannot fault Chew for his reasoning, or for proceeding as he did. In our view the initial stop, in the circumstances we have described, met the criterion of using the least intrusive means reasonably available under the circumstances.

█ Soun argues that even if the initial stop were regarded as a detention, the detention evolved into a de facto arrest when the individuals, seated in separate police cars, were moved three blocks to a parking lot that was known to police and had apparently been used by them, as an assembly area, on previous occasions.

We cannot agree with Soun.

By this time Fenton had arrived at the stop site. Once the individuals had been placed in separate cars, Chew showed Fenton the Williams letter. It was the first time Fenton had seen the letter; his watch had not been briefed on it. Fenton, a patrol division beat supervisor for that area, then as a practical matter took charge. He wanted to find out what San Jose wanted done, and decided to make his calls from Oakland police headquarters which was no more than five minutes' travel from the stop site. As he left for police headquarters, within a few minutes after the stop, Fenton directed that the six individuals be moved to the parking lot. Fenton was not asked, and did not volunteer, his reasons for moving the individuals, but another officer offered

reasons wholly consistent with the known circumstances and with common sense: She testified that Fenton "directed us to move to an assembly point because we were blocking the roadway and there [were] so many cars. [¶] . . . [¶] It was typical procedure. [¶] . . . [¶] It had nothing to do with the arrest situation. It was merely for officer's safety and to clear the roadway." A three-block transportation to an essentially neutral site for these rational purposes did not operate to elevate Soun's custodial status from detention to arrest.

Finally, Soun argues that the period of time for which he was held at the parking lot was unduly protracted and therefore must in any event be deemed to have amounted to de facto arrest. Again we disagree with Soun. The record reflects that Soun was at the parking lot for approximately 30 minutes. Fenton fully accounted for this period of time, testifying that he went to police headquarters, made initial contact with Sergeant Robinson, realized in conversation with Sergeant Robinson that he would need more exact information concerning the detained individuals, returned to the parking lot where he could obtain the information, again established communication with Sergeant Robinson, and then, as soon as he and Sergeant Robinson had concluded that the individuals should be interrogated, arranged to have the individuals moved to interrogation rooms at police headquarters. In short, Fenton diligently pursued a means of investigation reasonably designed to dispel or confirm his suspicions quickly. (Cf. *In re Carlos M.*, *supra*, 220 Cal.App.3d at pp. 384-385; *United States* v. *Sharpe*, *supra*, 470 U.S. at pp. 686-688 [84 L.Ed.2d at pp. 615-617].) The detention was no more protracted than was reasonably necessary for that purpose.

We conclude that from the time the car was stopped until he was transported from the parking lot to police headquarters, Soun was in temporary or investigative detention and not under de facto arrest.

■ The next question is whether the detention was permissible in the circumstances known to the detaining officers or to the officers who directed that the individual be detained.

■ " '[I]n order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him [her] to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he [she] intends to stop or detain is involved in that activity. Not only must he [she] subjectively entertain such a suspicion, but it must be objectively reasonable for him [her] to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his [her]

training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question. The corollary to this rule, of course, is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. [Citation.]' " (*In re James D., supra,* 43 Cal.3d 903, 914, quoting *In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957].) It is now clear that a detaining officer who is not personally aware of all the facts on which a reasonable suspicion might be based may nevertheless properly detain an individual on the basis of a direction or information transmitted by police officers who were personally aware of such facts. (*United States* v. *Hensley, supra,* 469 U.S. at pp. 231-232 [83 L.Ed.2d at p. 614]; cf. *Restani* v. *Superior Court* (1970) 13 Cal.App.3d 189, 195-196 [91 Cal.Rptr. 429].)

Soun argues that any detention effected by Chew and his colleagues in this case was constitutionally invalid for two reasons: first, because for want of witness consensus as to the description of the car or of any direct eyewitness recitation of its 1RCS558 license plate number, there was no sufficient factual basis for a reasonable suspicion of the car and its occupants; and, second, because San Jose police's Saturday communication to Oakland police did not request a detention or arrest and specifically requested that no action be taken.

To the first point, Soun argues that "[w]itness statements as to make, year and color of the robbery getaway car were widely divergent," that "[t]he license plate number broadcast had not been reported by any witness, and was a number literally created by police," and that in sum the detention, based in substantial part on the DMV description of Nhim's car, was impermissibly based on "hunches and supposition." Soun asserts that the method Officer Kranich used "generated no more than an investigative lead that should have been pursued by other means," and that it was "unreasonable to detain the vehicle or its occupants without further information."

Soun's argument is fatally flawed in two respects.

First, his "hunches and supposition" label substantially mischaracterizes intelligent and resourceful police work. This was not a simple case of a bungled theft, which might have lent itself to contemplative investigation as officers could fit it into their schedules: this was a cold-blooded murder, possibly committed with a semiautomatic rifle, which called for urgent investigation and resolution. The very fact that witnesses' excited perceptions of important details were so divergent might well have stymied the investigation, or at least have substantially delayed it while evidence, and

perhaps the perpetrators themselves, were lost, had not the police been willing to apply logic to the divergent accounts.

A logical approach was made possible by the perceptions that all witnesses' accounts of the car were essentially consistent in three important respects: There was only one car with (presumably) only one license plate number; the car was a small foreign-made sedan (probably Japanese and possibly a Toyota, although also possibly a Volvo); and the first five characters of the license plate number were 1RCS5.

Once Kranich determined that none of the three reported numbers of which he was aware would provide a match that remotely resembled any of the witness-furnished descriptions, he went to hypothetical combinations of numbers. With only two numeric characters to be filled in, the police had only 100 possible combinations—1RCS500 through 1RCS599—to run. Taking note of the predominance of 5's and 8's in witnesses' recollections of the license numbers, and taking account of the visual similarities between 5's and 8's, on the one hand, and the 3 (and to a lesser degree the 2) mentioned by separate witnesses, Kranich decided initially to try only combinations of 5's and 8's. Soun implies that this approach was "haphazard" but a more rational explanation is that it was a commendable attempt to save time: if Kranich's visual-similarities hypothesis was valid and his choice of 5's and 8's fortuitous, then he would be required to run only four combinations (1RCS555, 1RCS558, 1RCS585, 1RCS588) rather than one hundred; if he found no match he could run more combinations using other numbers. To his credit, Kranich did not limit himself to the last two characters but instead allowed for the possibility that all witnesses had mistaken the first of the final three numeric digits: thus he had eight combinations of 5's and 8's—three 5's, three combinations of two 5's and an 8, three combinations of two 8's and a 5, and three 8's—to run. He ran five or six of the combinations and encountered Nhim's car, which seemed to him a likely match because (1) it was a Toyota sedan, (2) Nhim's name sounded Asian and the crime had been committed in a primarily Asian neighborhood, and (3) Nhim's address was in Oakland and at least one witness had indicated the car was last seen headed in the general direction of Oakland. Kranich ran one more combination; he might have run many more—up to one thousand, to account for all possible combinations of any three numeric characters— but Nhim's car was clearly the best match he had found: "Nothing else that was coming back at that time . . . was close to the make and model reported by the witnesses"; the other returns "mostly were American make cars . . . ." In Kranich's own words (and even without hindsight) Nhim's car "would be a very likely candidate for . . . further investigation . . . ." It is not clear whether, at this point, Kranich was aware of Crown's sighting on

the Highway 880 on-ramp. Although Crown's description of the Toyota he saw made it much newer, and of a different body style, than the car registered to Nhim, the sighting of the man with a rifle near the car tended to lend some weight to the assumption that the car involved in the crime was moving toward Oakland.

That other San Jose officers agreed with Kranich that further investigation was what was called for is reflected in Seaman's communication to Williams that Oakland officers should simply undertake to locate the car.

But this leads to the second flaw in Soun's argument: Contrary to his implication, Chew *had* "further information" by the time he detained Soun and his confederates. Chew had seen six Asian males in the car, and had observed their apparently self-conscious reactions to his presence. Soun correctly asserts that what Chew saw would not have been sufficient, in isolation, to warrant a detention, but of course Chew was not required to consider the information in isolation: The coincidence with descriptions of the assailants, and the use of a car which was, at least, "a very likely candidate for . . . further investigation," was sufficient to justify the detention.

■ Soun's second point is, in essence, that the Oakland police had no legitimate business detaining him because the San Jose police had not *requested* that he be detained (and had, in fact, suggested that no action be taken). The difficulty with this point is similar to one of the difficulties with Soun's first point: it takes no account of actual events in Oakland on Sunday. Seaman's request, as relayed by Williams, patently contemplated that the Oakland police might find the *car*, and that the San Jose police should be permitted to take the investigation from there. But neither Seaman nor Williams could reasonably be understood to have given direction as to what to do if individuals who resembled the descriptions of the perpetrators should be found in juxtaposition with the car. Chew and his colleagues must be credited with a reasonable response to the situation as it actually developed. In any event the question whether the Oakland police did or did not respond to the wishes of the San Jose police would be essentially irrelevant to the dispositive question whether, on the basis of all the *facts* known to him on the basis of both the San Jose communiqués and his own observations, Chew could with constitutional propriety seize Soun and his confederates. Unquestionably the answer is yes. *United States* v. *Hensley, supra,* 469 U.S. 221, on which Soun relies for this point, is distinguishable: *Hensley* is one of the substantial class of cases that demonstrates the principle that a police officer who receives a request or direction, through police channels, to detain named or described individuals may make a constitutionally valid detention, even without personal knowledge of facts sufficient to justify the

detention, so long as the facts known to the police officer or agency that *originated* the request would be sufficient. Here Chew himself knew facts sufficient to justify the detention; there was no occasion to look for or to rely on a request through police channels that Soun be detained.

Under our analysis the detention continued for approximately 45 minutes altogether, to the point at which Soun and his confederates were transported from the parking lot to Oakland police headquarters. Despite the diligence of Fenton and other Oakland officers in seeking further information from San Jose, nothing was developed either to confirm or to dispel the officers' suspicions until near the end of the period, when Sergeant Robinson and Fenton were able to discuss specific physical evidence and descriptions. The fact most of the witnesses in San Jose has described a car which was blue, like Nhim's, was not known to Chew when he made the stop but became known to Fenton from Sergeant Robinson. Fenton was also able to provide details of physical stature and dress—including a reversed 49er's baseball cap—which matched the information Sergeant Robinson had obtained from witnesses. By the end of the 45 minutes the officers' suspicions had been substantially confirmed and Sergeant Robinson had concluded—and Fenton ultimately acknowledged that he agreed—that they had probable cause to arrest all 6 of the occupants of the car for the murder of Khun.

We agree with the conclusion Sergeant Robinson and Fenton reached. To determine whether the facts known to them "would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that the person arrested is guilty of a crime" (*People* v. *Price, supra*, 1 Cal.4th at p. 410), we once again look to the totality of the surrounding circumstances and decide the case on its own facts. (Cf. *People* v. *Guajardo* (1994) 23 Cal.App.4th 1738, 1742 [29 Cal.Rptr.2d 21].) We have cataloged the facts known to the point at which Fenton talked with Sergeant Robinson. Their conversations provided direct comparisons between the information gathered from witnesses in San Jose and Fenton's observations of the car and its occupants in Oakland. Sergeant Robinson later testified that "[t]he first thing that I noted right away . . . was that there were six suspects in the vehicle, and we had been informed by witnesses at the scene that there had been up to six people involved in the shooting. [¶] . . . [¶] I asked Sergeant Fenton if one of the taller individuals might be wearing a red 49'er baseball cap backwards." A witness had mentioned the cap. Fenton replied that a tall individual was wearing such a cap; in his subsequent testimony Fenton recalled that Sergeant Robinson seemed rather excited by Fenton's reply. Fenton was also able to affirm for Sergeant Robinson that the six individuals appeared to be Asian. Sergeant Robinson recalled in testimony that "[t]he witnesses at the scene of the shooting described some of the defendants to, as appearing to be

twelve years old in appearance, and others to be as old as eighteen to twenty years old. [¶] . . . [¶] Sergeant Fenton stated that there was one individual in the car that appeared to be twelve years old . . . ." Fenton also told Sergeant Robinson that the vehicle was a metallic blue 1981 Toyota two-door sedan, a description which generally matched that given by several of the witnesses in San Jose.

Sergeant Robinson concluded, and told Fenton, "that I believed he had all of the suspects responsible for our shooting in San Jose." Sergeant Robinson therefore asked Fenton "to ask and obtain voluntary consent from the . . . suspects to go to the Oakland Police Department to be fingerprinted and photographed, and wait until we could arrive to contact or make contact with him. [¶] I then told Sergeant Fenton that if that was not possible, and the suspects stated that they did not wish to do that, that I wanted him to arrest those individuals and transport them to the Oakland Police Department until I could arrive with my partner."

Fenton undertook to obtain the voluntary consents Sergeant Robinson had asked him to seek, and testified that all of the individuals consented to be transported. Another officer's account differed from Fenton's, and the parties debate whether the evidence of record was sufficient, in the necessarily coercive circumstances at the parking lot, to support the magistrate's explicit finding that Soun and his confederates in fact consented. We need not resolve the point. Given that in the absence of consent the transportation to a police facility for interrogation would arguably have amounted to a de facto arrest (cf. *Dunaway* v. *New York* (1979) 442 U.S. 200, 211-213 [60 L.Ed.2d 824, 834, 99 S.Ct. 2248]; cf. also *People* v. *Harris, supra,* 15 Cal.3d at pp. 391-392), we conclude that at this point the arrest would in any event have been supported by sufficient probable cause. The facts known to the police in this case gave substantially more basis for "an honest and strong suspicion that the person arrested is guilty of a crime" (*People* v. *Price, supra,* 1 Cal.4th at p. 410) than did the facts in *In re Dung T., supra,* 160 Cal.App.3d 697, on which Soun relies. In *Dung T.* the perpetrators of a robbery had been described as six Vietnamese males in their early twenties riding in a Dodge automobile; two nights later police stopped a Dodge (which had been positively identified by a witness) which contained *eight* young Vietnamese males, including the minor, who was then fifteen years old. The Court of Appeal concluded that the officers' observations had been sufficient to detain but not to arrest: "The police had no detailed descriptions of the robbers other than their ages and nationalities. There were eight people occupying the car when it was stopped, but only six people were involved in the robbery. Thus at the time of the stop the police did not have probable cause to believe any one of the occupants of the car, including [the

minor], was guilty of the robberies." (160 Cal.App.3d at p. 713.) In this case the numbers, general ethnic appearance, specific articles of clothing, and ages specific to persons of particular statures all matched, and the stop was effected on the morning following the afternoon killing: the totality of these circumstances far more directly supported an honest and strong suspicion of guilt.

The seizure of Soun's person did not violate the Fourth Amendment.

*Motive**

. . . . . . . . . . . . . . . . . . . . . . . . . . .

The judgment of conviction is affirmed.

Premo, Acting P. J., and Elia, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 10, 1995.

---

*See footnote, *ante,* page 1499.