Filed 12/23/13  P. v. Hernandez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047223 |
| v. | (Super. Ct. No. 09NF3157) |
| STEVEN SALVADOR HERNANDEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James Edward Rogan, Judge.  Affirmed as modified.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

An information charged Steven Salvador Hernandez, Jose Francisco Nuno, and Rene Antonio Lobos with murder committed for the benefit of, at the direction of, or in association with a criminal street gang.[1] A jury convicted Hernandez of second degree murder and active participation in a criminal street gang, and found true the criminal street gang enhancement. The trial court sentenced Hernandez to serve a total prison term of 15 years to life.

Hernandez challenges the trial court's denial of his motion to suppress DNA evidence obtained during the criminal investigation. He also contends the trial court erred by imposing a parole revocation fine (Pen. Code, § 1202.45; all further statutory references are to the Penal Code) in an amount greater than that imposed for the restitution fine (§ 1202.4, subd. (b)) and by failing to stay sentence for active participation in a criminal street gang (§ 654.). Finally, he requests certain modifications to the abstract of judgment to accurately reflect the trial court's imposition of sentence. The Attorney General asserts the trial court correctly denied Hernandez's motion to suppress evidence, but concedes the remaining issues and we agree. Therefore, the judgment is affirmed as modified.

**FACTS AND PROCEDURAL HISTORY**

Joshua Rodriguez was stabbed and killed during a fight at a 2009 Halloween party at a home in La Habra. Hernandez, a member of the All West Coast (AWC) criminal street gang, attended the party with several friends and fellow gang members.

After the stabbing, officers from the La Habra Police Department responded to the scene and found 13 people, including Hernandez, hiding in the party house. Hernandez and four others had what looked like blood on their clothing, and the

---

[1] Nuno and Lobos are not parties to this appeal.

officers separated them from the other eight people in the house for a period of time at the scene while they conducted their investigation.

Eventually, all 13 individuals were transported from the crime scene to the La Habra Police Department, which was about a mile away. Once there, the officers seized Hernandez's blood-stained clothing, took his statement, and collected fingerprints, photographs, and a sample of his DNA. During his recorded interview, Hernandez denied being an AWC gang member, and he denied any involvement in the fight. Nuno and Lobos were arrested, but the other 11 people, including Hernandez, were driven back to the crime scene.

The morning after the party, a neighbor found a knife, clown mask, and Pendleton jacket in his backyard. Rodriguez's blood was found on pants Hernandez surrendered the night of the incident and on the outside of the jacket, mask, and the knife blade. Hernandez's DNA was found on the inside of the jacket and mask.

At trial, Matthew Garcia, one of Hernandez's friends and fellow gang members, testified in exchange for a favorable plea agreement in a separate criminal case. According to Garcia, Hernandez brought a knife to the party, and a few days after the party, Hernandez admitted stabbing Rodriguez. Hernandez also told Garcia he had drawn the knife just to scare Rodriguez, who would not stop fighting with a group of AWC members, but Rodriguez had been accidently stabbed in the neck because he moved suddenly. Hernandez claimed he had disposed the knife and mask by rolling them into his jacket and throwing them over a fence.

The prosecution's gang expert, La Habra Police Officer Michael Costanzo testified Hernandez was an active member of AWC, and that he was providing backup to other AWC gang members when he stabbed and murdered Rodriguez.

*Motion to Suppress*

Hernandez filed a pretrial motion to suppress evidence of anything "recovered or developed" from his DNA sample.[2] At the suppression hearing, La Habra Police Officer Timothy Eugene Shea testified that he was dispatched to an address in La Habra on a report of an assault with a deadly weapon at approximately 12:30 a.m. on November 1, 2009. When he arrived, Shea saw Rodriguez lying in the street, bleeding profusely from his neck. Other officers from the La Habra Police Department had already directed several people to sit on the curb in front of the house where the party occurred. In addition, there were individuals walking and milling around.

According to Shea, witnesses told the officers they had seen four to seven gang members start a fight with Rodriguez in the street in front of the party house. They also said that one of the gang members made a slashing motion at Rodriguez, which was followed by blood spraying from Rodriguez's neck. Rodriguez stumbled and collapsed while his attackers ran back to the party house.

Several uniformed officers, including Shea, went to the house to investigate. The house was dark, but Shea heard people moving around inside. Officers knocked on the front door, identified themselves, and directed everyone to come outside. About 10 minutes later, 13 people came out a door in the back of the house. As they walked by the officers to the front of the house, Shea noticed several of them had what looked like blood on their clothing. These individuals were separated from the others and directed to sit on the curb in front of the house.

Around 3:00 a.m., Shea and two other officers asked the group of 13 if they would voluntarily come to the police department to give statements. According to Shea,

---

[2] Hernandez also challenged aspects of the DNA and Forensic Identification Database and Data Bank Act of 1998, as amended (the Act). (§§ 295, et seq.) The trial court did not rule on this aspect of Hernandez's motion, and we decline to discuss the Act because it is unnecessary to do so in light of the issues presented.

all of them agreed to go, and they were transported together in a van to the La Habra Police Department, which was about a mile away. Shea testified none of the individuals had been handcuffed before or after they were transported.

La Habra Police Officer Eric Ocampo testified he was dispatched to the area on a report of a fight. After talking to witnesses, Ocampo and other officers approached a house in an attempt to secure it. None of the lights inside or out of the house were lit.

Ocampo knocked on the front door and identified himself as a La Habra police officer. No one responded initially, but Ocampo heard people moving around inside. He and several other officers waited for a few minutes, and eventually 13 people came out of a sliding glass door in the back of the house. The officers patted them down for officer safety, but Ocampo did not recall seeing anyone being placed in handcuffs. He and the other officers moved the group from the backyard to the front of the house. He testified that he told everyone "they were not under arrest, that we were conducting an investigation as to what had taken place out in front of the house."

La Habra Police Sergeant Jason Forgash testified he was at the La Habra Police Department when a group of 13 individuals arrived together. Some of the 13 individuals were told to wait in the covered sally port area of the department while others were inside in a briefing room. He told all 13 people "we're obviously here conducting an investigation. We want to get you out of here as quickly as possible. What we'd like you to do is come in and meet with this gentleman. He's going to photograph you. Depending on if you have blood on your clothing, he may take some articles of clothing and then we're going to get a DNA swab from your cheek. It doesn't hurt. There's nothing difficult about it. It will just take a few minutes. And we can get you out of here and get you on your way."

Forgash explained his role at the station as being the person who directed other officers and tried to "limit the chaos, to make sure everything gets done in an

5

expedient fashion so we can get [the 13 individuals] all home because they're all there voluntarily." He testified all of the individuals agreed to "it," and that they were later transported back to "where they needed to go." Forgash did not recall any arrests being made that night, although the parties stipulated Nuno and Lobos had been arrested that night. Forgash testified he could not recall the exact wording he used with the individuals to advise them of what the officers wanted to do, but he would have explained the purpose of the DNA test if anyone had asked.

La Habra Police Officer William Irwin had also been at the police station on the night of the shooting. He testified, "we were in the process of interviewing everybody that was — that we had at the police station regarding the incident. And I asked [Hernandez] if he could follow me to the interview room, where he'd be interviewed concerning the incident." After about an hour interview, Hernandez was led back to the sally port. Irwin did not know if Hernandez had been handcuffed at the scene, but he was not handcuffed at the police station.

Hernandez also testified at the suppression hearing. He said a group of five people, those with the suspected blood stains on their clothing, had been handcuffed and told to sit on the curb in front of the house. The remaining eight people in the house were detained in the backyard for about an hour before being transported as a group to the police station. Hernandez claimed he and the other four individuals with suspected blood on their clothing remained at the scene. Shortly afterward, an officer removed the handcuffs and told Hernandez he would be taken to the police station to get his statement.

Hernandez said he was transported to the police station in the back of a police cruiser, and not in a van as the police officers had testified. Once he arrived at the police station, police officers directed him to sit in the sally port area on a bench. He was alone when he first sat down, but other people soon joined him. Then, after another hour passed, he was taken into an interview room. After the interview, Hernandez was walked to another building where someone took his picture, asked him to remove his clothing,

6

ran a Q-tip around his fingers, and took a swab from his mouth. Afterward, he was returned to the bench in the sally port.

Hernandez testified no one asked him if he would be willing to go the police station, they simply told him he would be transported. He also said no one explained the DNA test to him. In fact, he thought the officer swabbed his mouth to determine if he was under the influence of anything.

At the conclusion of the hearing, the court made the following factual findings: (1) Police officers were dispatched to a report of an assault with a deadly weapon; (2) when they arrived, Rodriguez was bleeding from the neck and either dead or in the process of dying; (3) two civilian witnesses told the officers that a group of between four to seven gang members jumped Rodriguez; (4) one of the attackers made a slashing motion at Rodriguez's throat that precipitated blood spraying from a neck wound; (5) all the attackers ran back to the party house; (6) the officers knocked and gave notice but the suspects did not come out for between five to 15 minutes; (7) when they did come out of the house, five of the 13 individuals had blood stains on their clothing; (8) Hernandez, who was one of the five with blood stains on his clothing, was handcuffed for a short period of time; (9) all 13 detainees were told they were not under arrest; (10) they were asked if they would voluntarily go to the police station to be interviewed; (11) all of the participants agreed; (12) Hernandez and the others voluntarily remained at the police station for a period of time until they were interviewed and evidence collected before being released.

Based on these factual findings, the trial court held that police officers had reasonable cause to detain Hernandez at the scene. Referring to *Florida v. Royer* (1983) 460 U.S. 491, *People v. Celis* (2004) 33 Cal.4th 667, *In re Tony C.* (1978) 21 Cal.3d 888, and *United States v. Sharpe* (1985) 470 U.S. 675, 686-687, the court stated, "given the fact we have a murder victim in the street, two eyewitness statements, and blood found on several subjects, persons, including Mr. Hernandez, the court finds that when the

7

officers considered the totality of the circumstances, they had plausible ground to believe Mr. Hernandez may have committed a crime. [¶] This was sufficient cause to detain him while they secured the residence, searched the many subjects, and made arrangements to interview the various witnesses."

As to whether Hernandez consented to go to the station to be interviewed and to submit to various evidentiary collection procedures, the court found "nothing in the record to contradict persuasively the officers' respective accounts of the defendant and others being uncuffed, told there were not under arrest, being asked to go to the station and provide voluntary statements, and to consent to the collection of evidence." The court also relied on Hernandez's own testimony to conclude his transportation to the police station and cooperation with the officers once he arrived there was also done with his consent under an objective test and considering the totality of the circumstances. (See *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 227-234, [when the subject of a search is not in custody and the state would justify a search on the basis of consent, the Fourth and Fourteenth Amendments require that it demonstrate that consent was in fact voluntary]; *Kaupp v. Texas* (2003) 538 U.S. 626, 633-634 [suspect removed from home in his underwear, taken to a crime scene, and then delivered to the police station]; *United States v. Mendenhall* (1980) 446 U.S. 544, 558-559 [whether consent to accompany the police is voluntary or the product of duress or coercion is to be determined by the totality of the circumstances].)

The court placed great weight on certain aspects of Forgash's testimony. Specifically, Forgash testified he requested, not ordered, the 13 people to submit to various tests. He also stated the individuals were processed as quickly as possible so they could be "transported . . . back to where they needed to go." As the court concluded, "[a]nd so it appears to the court from the testimony and from everything I've heard that the individuals were asked for consent and that consent was given. [¶] As to the main issue of whether the defendant was asked to accompany the officers and provide the

8

samples and his voluntary agreement to do so, the court finds that the officers' testimony was credible. [¶] So given the totality of the circumstances including a consideration of Mr. Hernandez's age and status as a minor at the time of the incident, the court finds nothing fatal to the finding of consent and it is for all of the forgoing reasons that the motion to suppress is respectfully denied."

## DISCUSSION

Hernandez challenges the trial court's ruling on his motion to suppress evidence, insisting that he did not consent to being transported to the La Habra Police Department, nor did he understand or consent to have his DNA collected.

A seizure within the meaning of the Fourth Amendment occurs whenever an individual's liberty is restrained by the police, either by physical force or by an assertion of authority to which the individual submits, in circumstances in which a reasonable person would have believed he or she was not free to leave. (*People v. Soun* (1995) 34 Cal.App.4th 1499, 1515.)

Although "detention[s]" and "arrest[s]" are both seizures under the Fourth Amendment, the constitutional standard for permissible detentions "is of lesser degree than that applicable to an *arrest*." (*People v. Harris* (1975) 15 Cal.3d 384, 389.) "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. [Citations.] It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." (*Florida v. Royer*, *supra*, 460 U.S. at p. 500.)

Hernandez does not contest the legality of his detention at the scene. Instead, he claims to have been transported and held at the La Habra Police Department against his will. However, his argument depends on this court's rejection of the trial

9

court's credibility determination. Hernandez claims his "account is both more detailed and more plausible" than the testimony of the officers involved. But this court must be deferential to the trial court's credibility determination if supported by substantial evidence. (*People v. Soun*, *supra*, 34 Cal.App.4th at p. 1507.) We then use our independent judgment to determine if the facts found by the trial court establish a seizure in violation of the Fourth Amendment. (*Ibid.*)

Here, the trial court found the officers' account of events at the scene and police station more credible than Hernandez's recall of these events, notwithstanding the inconsistencies between the individual officers' recollections. Substantial evidence supports the court's factual findings. We have reviewed the trial court's ruling, which was based on its consideration of a totality of the circumstances, and Hernandez fails to undermine the trial court's credibility assessment.

Hernandez cites the following seven factors to be considered in determining when consent is voluntary: (1) physical domination of the defendant; (2) implied threats; (3) lack of a specific statement that consent can be withheld; (4) presence or absence of a consent form; (5) whether *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436) warnings were given; (6) physical acquiescence without a verbal response; and, (7) the defendant's age, education, intelligence, and knowledge of the law.

We find nothing in the record to confirm Hernandez's claims that the officers impliedly threatened him by advising him what the officers wanted to do *in exchange* for a ride back to the scene, physically dominated the detainees by engaging in an unnecessarily prolonged detention with intermittent use of handcuffs, or by failing to adequately advise the detainees of exactly what procedures they had consented to perform. Under the facts found by the trial court, Hernandez, who was 17 years old at the time, has not persuaded us that he misunderstood what the officer said, or felt intimidated into cooperating.

10

Hernandez's reliance on *Dunaway v. New York* (1979) 442 U.S. 200, is misplaced. In that case, the police had vague suspicions that Dunaway, a teenager, was involved in a robbery. However, despite the absence of probable cause, they decided to arrest him. When officers found him at a neighbor's residence, they asked him to accompany them to the station without informing him that he was free to refuse. Although he consented to their request, they were prepared to physically restrain him if he did not cooperate. The Supreme Court held that Dunaway was seized for purposes of the Fourth Amendment. (*Id.* at p. 207.)

Here, although there was probable cause to arrest at least those individuals with blood on their clothing at the scene, all 13 of the people who hid inside the party house were told they were not under arrest. Instead, the officers asked if they would voluntarily come to the police station to make statements. According to the police officers, everyone agreed to be transported. Nothing Hernandez points to in the record undermines the trial court's determination on this point.

Once at the police station, officers again advised them they were not under arrest. Five individuals, including Hernandez, were separated from the others, but Hernandez was not further isolated, and he was later joined by the other people with blood on their clothing. Forgash asked the group of five if they would allow a DNA swab, and according to Forgash everyone agreed. Hernandez had already been advised that blood-stained clothing would be confiscated, and he does not even suggest his subsequent interview was involuntary.

After Hernandez's interview, where he denied any participation in the murder, an officer walked him to another area in the station where a technician examined his hands, photographed him, and swabbed his fingers and mouth. Again, Hernandez was not arrested, and he admits he was returned to the neighborhood where the crime occurred. Hernandez admitted he was only briefly handcuffed at the scene, and there is

11

no evidence he was threatened with physical restraint, arrest, or anything else to obtain his DNA sample.

While "the compulsory, nonconsensual extraction of DNA samples constitutes a search and seizure under the Fourth Amendment" (*People v. Travis* (2006) 139 Cal.App.4th 1271, 1281), "[a] search conducted pursuant to consent 'is a constitutionally permissible and wholly legitimate aspect of effective police activity.' [Citation.]" (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1577-1578.) In this case, the evidence supports the trial court's finding that Hernandez consented to the collection of his DNA.

*Modifications to the Judgment*

Hernandez contends, and the Attorney General agrees, that the court improperly imposed a $10,000 parole revocation fine when it imposed a $5,000 restitution fine. (§ 1202.45 ["the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed [for a restitution fine] pursuant to subdivision (b) of section 1202.4."].) The Attorney General seeks to remand the matter for the court to decide which amount, $10,000 or $5,000 should be imposed for both fines. However, we exercise our authority to modify the judgment (§ 1260) to impose $5,000 for both fines.

Hernandez also asserts the court improperly imposed sentence for active participation in a criminal street gang in violation of section 654. The Attorney General concedes the issue and we shall modify the judgment accordingly.

Finally, Hernandez and the Attorney General agree the abstract of judgment fails to reflect a $30 criminal conviction assessment fee and a $40 court operations fee that was imposed for each count.

12

## DISPOSITION

The judgment is modified to reflect the imposition of a $5,000 parole revocation fine and a stay of sentence on count 2 pursuant to section 654. It is corrected to reflect the imposition of a $30 criminal conviction assessment fee and a $40 court operations fee on each count. The clerk of the superior court is directed to amend the abstract of judgment to reflect these changes and forward a copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.

13