Filed 6/13/16  P. v. Vasilkov CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>ANTON M. VASILKOV,<br><br>    Defendant and Appellant. | A142806<br><br>(San Francisco County<br>Super. Ct. No. 1404029) |

After his motion to suppress was denied, defendant Anton M. Vasilkov pled guilty to one count of battery causing serious bodily injury (Pen. Code § 243, subd. (d)), and admitted a serious felony allegation.  He contends the trial court erred in denying his motion to suppress because his initial detention was not supported by reasonable suspicion and that it transformed into a de facto arrest that was not supported by probable cause.  Although we conclude that defendant's initial detention was proper, his pre-arrest transportation to an in-the-field identification site constituted an impermissible restraint on defendant's personal freedom.  Accordingly, we agree that defendant's Fourth Amendment rights were violated and we reverse.

1

# I. BACKGROUND

## A.    Facts

The following evidence was received at the preliminary hearing.  On January 16, 2014, at approximately 3:10 a.m., Dennis Byas was walking alone through Dolores Park in San Francisco to where his car was parked on 20th Street, when three young men approached him.  Byas described them all as white or Latino, in their late teens or early 20s, between five foot seven and five foot nine, medium build, and clean-shaven.  One man had long, thick, curly hair.

As Byas walked by the group, one of the men tried to "fist pump" him as a greeting.  Byas kept walking until the three men suddenly surrounded him.  The men started shouting at Byas, grabbed him, pushed him to the ground, and started to go through his pockets.  One stood on Byas' left side, held a knife against his throat and he was told not to move.  Another had his hand inside of his pocket and was simulating what Byas believed to be a gun.

The men demanded that Byas empty his pockets; he complied, relinquishing his car keys and his eye glasses.  Looking for more items, the group forced Byas onto his hands and knees so they could search the rest of his pockets.  Byas walked toward 18th Street, the three men fled on foot in the opposite direction.

A few minutes later, at about 3:14 a.m., Darryl Bass and Jessie Manuel were sitting on the steps near the bridge leading to Church Street in Dolores Park, with their friend Patrick who was standing on the nearby train tracks.  A man approached them with a warning that three persons a short distance away were robbing people.  Bass could see a group of three men heading his way as the other man ran towards Church Street and out of the park.

One of the men from the approaching group, later identified as co-defendant, Julian Prestegui, walked up to Bass to ask for a cigarette.  Bass told Prestegui that he was smoking his last cigarette, but would give Prestegui his current cigarette when he was finished with it.  Prestegui then demanded, "Give me everything you got."  Bass laughed in response.  One of Prestegui's associates, later identified as defendant Vasilkov, pulled

2

out a knife and asked, "Do you think it's funny?" Bass replied, "Yes. I think it's funny." Bass then yelled for his friend Patrick. Defendant said, "Your niggers can't help you right now." He also told Bass that he would stab the next person who walked up the stairs. As defendant, Prestegui, and their unidentified associate began to walk away, Bass and Manuel walked down the stairs towards where their friend Patrick was located, telling him that they all needed to leave.

As the three friends ran along the train tracks towards Market Street, Bass noticed that Prestegui was right behind him. Bass elbowed Prestegui in the face and kept running; however, he stopped when he noticed Manuel had fallen to the ground. Patrick went ahead to look for help. Bass proceeded to fight Prestegui and the unidentified third assailant, while defendant held Manual at knifepoint and demanded everything Manuel had with him. Manuel gave defendant his wallet and phone.

Defendant then walked over to where his associates were fighting with Bass and said, "Let's get out of here." The suspects fled further into Dolores Park.

**B.**     ***Suppression Hearing***

At about 3:14 a.m., on the morning of January 16, 2014, San Francisco Police Officer Michele Quema, and her partner Officer Joshua, responded to 18th Street and Church Street in San Francisco on the report of an "A priority robbery." As one officer explained, "A is the highest priority of a call that we shall respond to. It means, basically, drop everything that you're doing because this is the most serious offense."

As their patrol car approached the intersection of 18th and Church Street bordering Dolores Park, Mr. Byas and two other robbery victims flagged Officers Quema and Joshua down. Byas told the officers that he had just been robbed by "three Hispanic males, . . . five feet ten inches tall, with skinny builds, approximately in their 20s, wearing dark clothing." Officer Joshua shortly thereafter broadcast this information over the dispatch system in order to inform other police units responding to the scene.

At about the same time, San Francisco Police Department Officers Justin Woo and Diane Khuu were also on duty and in uniform, patrolling the Mission District when they received a dispatch about an "A priority" involving "three Latin males," who were

3

wearing dark clothing. The dispatch indicated that the suspects had fled into Dolores Park and that a gun was involved.

Less than two minutes later, Officers Woo and Khuu arrived at the intersection of Dolores Street and 19th Street, which abuts Dolores Park. The officers got out of the their patrol car and began a sweep of the park. They had their flashlights lit as they moved towards the public restrooms located in the middle of the park. Officer Woo was able to see 100 feet to his left and to his right, including the lights from the nearby playground. Seeing no one, the officers continued to canvass the area until they reached the public restrooms.

Within one minute of entering the park, the officers found defendant and co-defendant, Prestegui, sitting a distance of five to six feet apart on the stairs on the west side of the public restrooms. With their weapons drawn, Officers Woo and Khuu, identified themselves as police officers and directed the men to show their hands. Defendant and Prestegui complied and did not make any attempt to stand up or walk away. Officer Woo determined that defendant and Prestegui "generally matched the description" of the suspects to the extent that they were both males wearing dark clothes, who "looked Latin." Prestegui was wearing all black. Defendant was wearing black jeans, a black shirt, and striped shirt or jacket; he was also wearing a red baseball hat. Officer Woo acknowledged that it was not reported that any of the suspects were wearing a hat.

After placing defendant and Prestegui in handcuffs, Officer Woo conducted a pat-down search of Vasilkov to check for weapons. He saw a black cell phone sticking out of defendant's pocket. Afterwards, Officer Woo noticed several objects in the area where the suspects had been sitting. These items included a folding knife laying on the steps within arm's reach of where Vasilkov had been sitting, and a set of keys atop a brown jacket, which was about one foot away from the spot where Prestegui was detained.

Once they were secured, Officer Woo left the suspects with his partner and another officer, so that he could accompany some of the robbery victims during a cold show. About ten minutes after the initial detention, Officer Woo met with three victims

4

at the intersection of 18th and Church Streets.  The cold shows began approximately five minutes later at a separate location.[1]  The police transported defendant and Prestegui in separate police vehicles to get them to the cold show site. The police also transported the victims to the cold show site.

Defendant, Prestegui, and at least one other suspect were presented at the cold shows.  At least one of the victims identified defendant or Prestegui as one of the individuals who had robbed them.

Defendant sought to suppress the items seized from him, particularly the cell phone, as well as all post-detention witness identifications, including those during the cold show.  Defense counsel argued there was no reasonable suspicion to detain defendant because he was not a Latin male and was not wearing dark clothing. (2 RT 75-76.)  Defendant and his co-defendant were not engaged in suspicious conduct, did not try to flee, and complied with the officers' demands.  Moreover, none of the items found in the suspects' vicinity at the time of detention was incriminating.   Defense counsel also argued that the officers really did not know how many others were present in the park and whether any of the suspects had left the park.  Defense counsel further asserted that the transport of defendant and Prestegui to a second location away from the site of their initial detention was an illegal arrest given there was no probable cause prior to the identification.  Finally, there was no testimony as to when the robberies actually took place, leaving it unclear whether the suspects "were somehow timely seized in relation to the actual event . . . ."  Thus, the defense maintained there was no reasonable suspicion, much less probable cause to detain or arrest defendant.

In denying the motion to suppress, the trial court made the following findings: "The evidence is that the call came in at approximately 3:14.  Within minutes, the officers responded to the specific area where the alleged perpetrators were seen to flee, which was Delores [*sic*] Park.  The officer testified that upon entering the park he and his partner used flashlights to scan the area. They proceeded from 19th and Delores [*sic*] up

---

[1]      It is unclear from the record where the cold shows were actually conducted.

until the middle of the park to the area of the public restroom using their flashlights to illuminate the area. [¶] [The officer] testified, without contradiction, that he could see approximately 100 feet in each direction. He also testified that there was streetlights which illuminated Delores [*sic*] Street. That using both the streetlights and the flashlight, he and his partner saw only two people. The first and only people they saw in the park were the two people that they detained. [¶] People's 2 and 3 depict two individuals, and based on those photographs, one of them is in what appears to be all back [*sic*], which in my view is consistent with his testimony that the description was that one of the Latin males was in dark clothing. The other, from what I can see, is wearing what appears to [be] black jeans and a black shirt. There is a striped shirt over it, but I certainly see dark clothing there. [¶] The circumstances were such that the area was not populated by anyone other than the two individuals; and although the description was that there were three individuals seen fleeing, two is certainly a subset of three. And under the circumstances, which was that this was a high priority call, that there was a report that there was a gun involved with it, that the officers took reasonable steps, first, to simply detain for purposes of investigating to determine whether or not the two individuals met the description they had, and that contrary -- I respectfully disagree with the defendant's characterization of what followed. [¶] The victims were in close proximity, albeit not immediately in the vicinity where the two suspects were detained, and the suspects were not under arrest, but based upon the facts I heard, they were simply moved for purposes of further investigation, which was reasonable under the circumstances of the offense that had occurred at 3:15 in the morning and the circumstances that were described. [¶] I do find it was reasonable for the officers to undertake the investigation that they did, and it's my understanding that upon being displayed to the alleged victims, the individuals were identified. That was the testimony, and therefore, they were, at that point, arrested and taken to the station."

6

## II. DISCUSSION

### A. *Standard of Review and Applicable Law*

The rules for review in a denial of a motion to suppress are well established. This court reviews the explicit and implicit factual findings to determine if they are supported by substantial evidence. (*People v. Soun* (1995) 34 Cal.App.4th 1499, 1507 (*Soun*).) We then exercise our independent judgment to determine if the facts found by the trial court establish a seizure in violation of the Fourth Amendment. (*Ibid.*)

A seizure within the meaning of the Fourth Amendment occurs whenever an individual's liberty is restrained by the police, either by physical force or by an assertion of authority to which the individual submits, in circumstances in which a reasonable person would have believed he or she was not free to leave. (*Soun, supra,* 34 Cal.App.4th at p. 1515.) Although "detentions" and "arrests" are both seizures under the Fourth Amendment, the constitutional standard for permissible detentions "is of lesser degree than that applicable to an *arrest.*" (*People v. Harris* (1975) 15 Cal.3d 384, 389 (*Harris*).) An officer is justified in detaining a suspect " 'if there is an articulable suspicion that a person has committed or is about to commit a crime.' " (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784.) On the other hand, probable cause for an arrest exists only "when the facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that the person arrested is guilty of a crime. [Citations.]" (*People v. Price* (1991) 1 Cal.4th 324, 410, superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161-1165.)

"[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. [Citations.] It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." (*Florida v. Royer* (1983) 460 U.S. 491, 500.)

7

### B.    *Initial Detention*

Defendant contends the police lacked reasonable suspicion to detain him. According to defendant, the discrepancies between his appearance and the "very general description" sent out by dispatch significantly undermined the finding that a reasonable officer in Officer Woo's position would have had a reasonable suspicion that defendant was involved in criminal activity.

According to defendant, the police lacked reasonable suspicion to detain him because his race and clothing did not match the "vague" description of the suspects, i.e., three Latin males, wearing dark clothing. Defendant insists inasmuch as he is "a light-skinned individual of European ancestry," who was wearing "a distinctive, lighter-colored, stripped sweatshirt," as well as a hat, Officer Woo lacked reasonable suspicion to detain him. We disagree.

Officer Woo testified that, although he was not sure of his racial or ethnic background, defendant "looked Latin . . . ." The trial court implicitly found that Officer Woo was a credible witness, and substantial evidence supports its credibility determination. (*People v. Ramos* (2004) 34 Cal.4th 494, 505.)

Moreover, it is undisputed that defendant was wearing black pants and a black undershirt. That defendant was also wearing a hat and stripped sweatshirt does not controvert these facts. An exact match is not required. (*People v. Craig* (1978) 86 Cal.App.3d 905, 911 (*Craig*).) Rather, "a general description has been held sufficient justification for stopping and questioning persons meeting that description." (*Craig, supra,* 86 Cal.App.3d at p. 911.) In *Craig*, police officers were acting on a general description of three robbery suspects. (*Id.* at pp. 910-911.) There, the victim described the suspects as follows: "The first was a male Negro, small Afro, five feet, nine inches tall, medium build, blue [L]evis. The second, a male Negro, medium Afro, yellow beanie-type hat with 'Cheerios' on the back, and a torn shirt. The third, a male Negro with a small Afro. When stopped, at least one suspect had pink curlers in his hair. There was no 'Cheerios' beanie and no torn shirt." (*Id.* at p. 912, fn. 1.) Despite these discrepancies, the court held that the officers acted reasonably in stopping and initially

8

detaining the defendants. (*Id.* at p. 912.) The court reasoned that even though the defendants "did not perfectly match the general description given, however, since the descriptions and appearances were substantially the same, and coincided in the discernable factors (race, sex, build, number), . . . the officers acted reasonably, under the circumstances . . . ." (*Id.* at pp. 911-912.)

In the instant case, neither defendant's race nor his clothing was an exact match. Nevertheless, defendant was near the scene of a recently reported crime in the company of another person matching the age, race, and sex of the first described suspect. This evidence, considered in light of the totality of the circumstances, provided Officer Woo with "specific articulable facts" demonstrating "some objective manifestation" that appellant was involved in criminal activity at the time of his detention. (*People v. Souza* (1994) 9 Cal.4th 224, 231.) While defendant insists that absence of a specific time of the robberies, together with the discrepancies in his clothing and race demonstrate the lack of reasonable suspicion, these facts do not diminish the probative value of the other evidence supporting the trial court's contrary finding. (*People v. Ramos, supra,* 34 Cal.4th at p. 505.) On this record, the officer could reasonably believe criminal activity involving defendant was afoot, thereby justifying the decision to detain him.

Finally, defendant further insists that even if he appeared to be "Latino," race cannot create reasonable suspicion. Defendant asserts that to find otherwise would result in impermissible racial profiling. He relies on *In re Tony C.* (1978) 21 Cal.3d 888 (*Tony C.*) and *People v. Durazo* (2004) 124 Cal.App.4th 728 (*Durazo*). Each, however, is distinguishable. In *Tony C.*, the officers were acting a on a "day-old burglary report" when they detained the defendant while he was merely walking along the sidewalk; they had no particularized basis for suspecting his involvement in any crime, but only "a combination of hunch and curiosity." (*Tony C., supra,* 21 Cal.3d at pp. 896-898.) But here, the officers were responding to a police dispatch made a very short time before, and reasonably believed the persons they found at the scene could have been the persons described in the dispatch.

9

In *Durazo,* the officer detained two young Hispanic males merely for apparently looking toward an apartment complex where four days earlier a resident had claimed Mexican gang members were going to attack him; as in the prior case, the detained persons did not do anything suggestive of criminal activity within the officer's view. (*Durazo, supra,* 124 Cal.App.4th at pp. 732-734.) Here, the officers responded almost immediately to a reported robbery involving a gun and found people on the scene who, judging from the initial information given to the officers, looked as though they could have been involved in that robbery.

Although reliance on race, *without more*, amounts to impermissible racial profiling (Pen. Code, § 13519.4, subds. (d), (e)), here the responding officers were acting on more than race. Unlike in *Tony C.* and *Durazo*, the officers were not acting on a mere hunch that defendant and his companion were involved in criminal activity. Rather, the officers immediately responded to a dispatch call regarding an "A priority robbery," involving a gun and encountered two Latino appearing men in Dolores Park just after 3:00 a.m., wearing similar clothing. The determination of reasonableness in the context of the Fourth Amendment is "inherently case-specific . . . ." (*Durazo, supra,* 124 Cal.App.4th at p. 735.) Under the totality of the circumstances of the instant case, it was objectively reasonable for the officers to believe that defendant had been involved in possible criminal activity.

## C.    *Scope of the Detention*

We begin by noting that although defendant was handcuffed at the time of the initial detention and subsequent transportation, that handcuffing did not necessarily transform the detention into an arrest. (*People v. Celis* (2004) 33 Cal.4th 667, 675 (*Celis*).) This does not mean, however, that handcuffing a suspect will *never* transform a detention into an arrest. The issue is whether the use of handcuffs during a detention was reasonably necessary under all of the circumstances of the detention. (*In re Carlos* (1990) 220 Cal.App.3d 372, 385.) We look to "the facts known to the officers in determining whether their actions went beyond those necessary to effectuate the purpose of the stop, that is, to quickly dispel or confirm police suspicions of criminal activity."

10

(*Celis, supra,* 33 Cal.4th at pp. 675-676.) Here, the officers detained defendant following a call regarding an "A priority robbery," which is the most serious type of robbery dispatch. The officers had reason to believe that more than one suspect was involved and that a gun had been used during the robberies. Additionally, as it was just past 3:00 a.m., it was very dark outside. In short, the evidence suggests that the officers had a reasonable basis to believe that defendant posed a danger to them and that handcuffing him was necessary to effectuate the purpose of the stop, i.e., to determine whether defendant had been involved in the reported robberies.

Once the officers decided there were reasonable grounds to detain defendant, they transported him to an in-the-field identification site. Thus, we must decide if the pre-arrest transportation of defendant to the in-field identification site was a violation of his Fourth Amendment rights. In making this determination, we find the California Supreme Court's decision in *Harris, supra,* 15 Cal.3d 384, instructive. In *Harris,* as well as here, "[t]he principal difficulty . . . arises from the police conduct following the detention when circumstances known to the police placed the case in that gray area in which the facts justify measures beyond detention but short of arrest . . . . [¶] The propriety of . . . an in-the-field transportation of suspects prior to arrest poses the principle issue in the case." (*Harris, supra,* 15 Cal.3d at pp. 389-390.)

*Harris* went on to explain: "[W]e are disinclined to hold that under no circumstances short of probable cause to arrest may an officer transport a suspect to another location for further interrogation or possible identification . . . . [¶] We can conceive of factual situations in which it might be quite reasonable to transport a suspect to the crime scene for possible identification . . . . Similarly, the surrounding circumstances may reasonably indicate that it would be less of an intrusion upon the suspect's rights to convey him speedily a few blocks to the crime scene, permitting the suspect's early release rather than prolonging unduly the field detention. [¶] Ordinarily there exist less intrusive and more reasonable alternatives to pre-arrest transportation. The officers may call or escort the witness to the detention scene for an immediate viewing of the suspect, or if they are able to procure satisfactory identification from the

11

suspect, arrangements may be made for a subsequent confrontation with the witness.  In addition, the consent of the suspect may be sought.  As . . . suggested in *People v. Mickelson* [(1963)] 59 Cal.2d 448, 454, rather than conduct an illegal car search the officers could have requested defendant 'to accompany the officers the few blocks to the [crime scene] . . . for possible identification . . . .'  [Citations.]"

The California Supreme Court held the transportation and continued interrogation of the defendant without exploring any other option violated the Fourth Amendment. (*Harris, supra,* 15 Cal.3d at p. 391.)

*In re Dung T.* (1984) 160 Cal.App.3d 697, 704, involved the investigation into a home invasion robbery.  The perpetrators were identified as six Vietnamese men in their early twenties, with no further description.  (*Id.* at p. 705.)  The night of the robbery a witness identified an unoccupied vehicle as one that was used in the robbery.  (*Ibid.*)  The following night an officer observed the vehicle being driven with eight Vietnamese youths inside.  (*Ibid.*)  The vehicle was stopped and the occupants were transported to the police station where Dung was identified as the driver of the getaway vehicle.  (*Ibid.*) The appellate court reversed on other grounds but held for the guidance of the trial court that the detention violated the Fourth Amendment.  (*Id.* at pp. 711-712.)

In analyzing the Fourth Amendment violation, *In re Dung T.* explained:  "The record is barren of any attempts by the police to employ methods of investigative detention less intrusive than immediately transporting appellant and his companions to the police station for a lineup identification.  In fact, [the officer] had standing orders to bring the car and its occupants to the police station as soon as it was occupied.  The car was under surveillance for at least a day but no attempt was made to ascertain its owner. No attempt was made to bring witnesses to the detention scene for an immediate viewing of the suspects.  Upon discovery of the Dodge the previous evening, the police brought [the witness] to the scene to identify the car.  No reason appears for not bringing him to the scene the following evening to determine if he could identify any of the occupants of the car.  The record discloses no evidence the police attempted to question the suspects, obtain their identifications or obtain their consent to being transported to the police

12

station for a lineup.  Only on arrival at the station did the police explain to the suspects what they were doing. [¶] . . . [¶]

"The record shows 'no attempt was made here to employ procedures which might comply with the requirements of the Fourth Amendment: . . .' [Citation.]  The People have failed 'to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.' [Citation.]  They have not shown appellant's detention was a 'rare case' justifying the magnitude of intrusion involved.  Thus, appellant's detention violated the Fourth Amendment and, through the due process clause,  the Fourteenth Amendment of the United States Constitution." (*In re Dung T., supra,* 160 Cal.App.3d at pp. 715-716.)

In *In re Carlos M*., supra, 220 Cal.App.3d at pp. 376-377, the victim was sexually assaulted.  The defendant was lawfully detained and then transported to the hospital where the victim was undergoing a sexual assault examination.  (*Id.* at pp. 382-385.)  In rejecting the defendant's claim that the Fourth Amendment was violated, the court explained, as follows:  "We conclude, under the facts of this case, the transportation was reasonable.  Because [the officer] spoke no Spanish, the language barrier prevented him from attempting to obtain consent.  The absence of identification, or even a residential address, rendered the 'arrangements for subsequent confrontation' option moot.

"The only option reasonably available to [the officer] was to bring the victim and the suspects together as expeditiously as possible. [The officer] understood that at the time he wished to arrange an in-field identification, the victim was undergoing a rape-victim examination. [The officer] (from prior experience) believed this would require about two hours. Although the victim was not suffering severe physical injuries, she was presumably 'unable to be taken *promptly* to view the suspects' in light of the trauma she had endured and the exigencies a rape-victim examination entails. To bring the victim to the suspects probably would have required [the officer] to detain them for two hours to await the completion of the examination, or to interrupt the examination and seek to transport the victim.

13

"The option selected by [the officer]—transporting the suspects to the hospital rather than attempting to transport the witness from the hospital to the location of the suspects—was eminently reasonable. Even assuming it would have been possible to interrupt the hospital examination, time would have been wasted in finding the victim and causing termination of the examination. Since transportation time in either event would be the same, the likely detention of the suspects would be less by virtue of the option selected by [the officer]—taking the suspects to the witness. [Fns. omitted.]" (*In re Carlos M., supra,* 220 Cal.App.3d at pp. 383–384.)

Relying on *Celis, supra,* 33 Cal.4th 667 and *Soun, supra,* 34 Cal.App.4th 1499, the People argue that defendant's pre-arrest transportation did not result in an impermissible de facto arrest because the officers used the least intrusive means available under the circumstances. These cases are distinguishable.

The People's reliance on *Celis* is misplaced because that case did not involve pre-arrest transportation. Rather, there the defendant, a suspected drug trafficker, was handcuffed and forced to sit in his yard while the police performed a protective sweep of his residence. (*Celis, supra,* 33 Cal.4th at p. 676.) Finding the officers acted diligently and swiftly, using the least restrictive means reasonably available, the court concluded the detention did not convert into a de facto arrest. (*Id.* at pp. 675-676.)

In *Soun, supra,* 34 Cal.App.4th 1499, the defendant "was removed from the car at gunpoint by a large number of police officers, was forced to lie on the ground, was handcuffed and placed in a patrol car, was transported from the site of the stop a distance of three blocks to a parking lot, and then was held at the parking lot for up to an additional thirty minutes, all without being told why he had been stopped or being permitted to communicate with his confederates." (*Id.* at p. 1517.) The defendant argued, among other things, that "even if the initial stop were regarded as a detention, the detention evolved into a de facto arrest when the individuals, seated in separate police cars, were moved three blocks to a parking lot that was known to police and had apparently been used by them, as an assembly area, on previous occasions." (*Id.* at p. 1519.) In rejecting the defendant's claim, the court found three-block transportation

14

did not elevate the detention to an arrest because the reasons offered for moving the suspects were "wholly consistent with the known circumstances and with common sense." (*Id.* at p.1520.) *In Soun*, one of the responding officers explained that they had been " 'directed . . . to move to an assembly point because we were blocking the roadway and there [were] so many cars. [¶] . . . [¶] It was typical procedure. [¶] . . . [¶] It had nothing to do with the arrest situation. It was merely for officer's safety and to clear the roadway.' " (*Ibid.*) As such the court concluded that "[a] three-block transportation to an essentially neutral site for these rational purposes did not operate to elevate Soun's custodial status from detention to arrest." (*Ibid.*)

Here, unlike in *Soun*, the record is devoid of any rational explanation for transporting defendant to the in-the-field identification site. No officer was asked, and none volunteered, any reasons for moving defendant. As in *In re Dung T., supra,* 160 Cal.App.3d 697, "[t]he record is barren of any attempts by the police to employ methods of investigative detention less intrusive than immediately transporting [defendant] and his companion[]" (*id.* at p. 715) to the in-the-field identification site. "No attempt was made to bring witnesses to the detention scene for an immediate viewing of the suspects." (*Ibid.*) No reason appears why the identification site was preferable to the detention site. The record also disclosed no evidence that the police attempted to obtain defendant's consent before transporting him to the identification site.

"The record shows 'no attempt was made here to employ procedures which might comply with the requirements of the Fourth Amendment: . . .' [Citation.] The People have failed 'to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.' [Citation.] They have not shown [defendant's] detention was a 'rare case' justifying the magnitude of intrusion involved." (*In re Dung T., supra,* 160 Cal.App.3d at pp. 715-716.)

We can surmise that the officers decided to move both the suspects and the victims to another location due to safety concerns. However, as a reviewing court, we cannot speculate as to what the officers might have thought. Rather, it was the prosecution's

15

burden to introduce evidence to establish that the investigative detention was sufficiently limited in scope. (*Florida v. Royer, supra,* 460 U.S. at 500.) This they did not do.

Thus, [defendant's] detention violated the Fourth Amendment and, through the due process clause, the Fourteenth Amendment of the United States Constitution." (*In re Dung T., supra,* 160 Cal.App.3d at p. 716.) Accordingly, the trial court erred in denying the motion to suppress.[2]

### III. DISPOSITION

The judgment is reversed and the cause remanded to the superior court. The trial court is directed to vacate its order denying the motion to suppress and enter a new order granting the motion. The trial court is directed to vacate the guilty plea if defendant makes an appropriate motion within 30 days after the remittitur is issued. In that event, the superior court should reinstate the original charges and allegations contained in the information if the prosecution so moves. If defendant does not move to vacate the plea, the trial court is directed to reinstate the original judgment.

---

[2] While the field identification should be suppressed, subsequent identifications of defendant need not be suppressed if the witnesses have an independent recollection of the crime. (*People v. Rodriguez* (1993) 21 Cal.App.4th 232, 241.)

16

_____

Reardon, J.

We concur:

_____

Ruvolo, P.J.

_____

Streeter, J